[Cite as *State v. Barrie*, 2016-Ohio-5640.]

IN THE COURT OF APPEALS OF OHIO

TENACLE APPELLATE DISTRICT

State of Ohio,                          :

     Plaintiff-Appellee,          :

                                     **No. 15AP-848**

v.                                     :          (C.P.C. No. 14CR-2289)

Alimu Barrie,                          :          (REGULAR CALENDAR)

     Defendant-Appellant.          :

---

D E C I S I O N

Rendered on September 1, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.

**On brief:** *Thompson Steward Flecha, LLC*, and *Lisa F. Thompson*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Alimu Barrie, appeals the judgment of the Franklin County Court of Common Pleas convicting him and imposing sentence following a jury trial. For the following reasons, we affirm the judgment of the trial court.

**I. Facts and Procedural History**

{¶ 2} On November 7, 2013, A.R. was working as a housekeeper at the Renaissance Hotel in Columbus. The hotel assigned two housekeepers to each floor, who worked independently to clean rooms in different parts of the floor. Furthermore, it was customary for the hotel to assign a person, whom A.R. described as a "houseman," to remove the used linens before a housekeeper arrived to clean the room and make the bed. (Tr. Vol. III at 46.)

{¶ 3} According to A.R., on November 7, 2013, at approximately 10:00 a.m., she entered room 927 and found that a houseman had not removed the linens from the bed.

As she prepared to clean the room, appellant, who was working as a houseman at the hotel, entered the room. A.R. asked appellant to strip the bed, but instead he began to inappropriately touch her.

{¶ 4} Specifically, A.R. stated that appellant approached her from behind while she was at the bed and grabbed her buttocks with both hands. A.R. stated that appellant's actions made her feel "uncomfortable" because she "didn't know what he was going to do. I didn't know if he was going to rape me or pull my pants down or anything like that." (Tr. Vol. III at 49.) A.R. pushed appellant away, but he continued to force himself on her. A.R. stated that appellant rubbed his genitals against her buttocks, grabbed her neck with his right arm, and then grabbed her breasts with both hands. Additionally, appellant told A.R. to "[s]uck his dick" and that "he wanted to fuck [her]." (Tr. Vol. III at 48.)

{¶ 5} After appellant touched her breasts, A.R. turned around, pushed appellant away, and told him to leave her alone. Appellant then left the room. A.R. stated that she did not scream for help because she was afraid that "[i]f I yelled * * * he was going to do something." (Tr. Vol. III at 52.) A.R. clarified that she was afraid appellant would rape her. Once appellant exited the room, A.R. stated she did not report the incident because she was "still scared"; instead, she resumed cleaning the room. (Tr. Vol. III at 53.) A.R. stated that she resumed cleaning because she "wanted to try to get my mind off of it and try to go on in my day." (Tr. Vol. III at 55.)

{¶ 6} Approximately 10 to 15 minutes later, appellant re-entered the room and resumed inappropriately touching A.R. According to A.R., this second incident lasted between 5 to 10 minutes. A.R. explained that the incident lasted for that period of time because appellant "kept on touching me and wouldn't leave me alone. And I had to keep on pushing him away and he kept on forcing his self on me." (Tr. Vol. III at 67.) A.R. agreed that appellant's attempts to touch her were "persistent" and "went on and on for a while." (Tr. Vol. III at 67.) Appellant attempted to touch her "front private part" with his hands and stated that he "wanted to fuck [her] pussy," but she pushed him away and told him to leave her alone. (Tr. Vol. III at 55, 56.) Appellant then exited the room.

{¶ 7} Once appellant left the room for the second time, A.R. told the other housekeeper on the floor what had happened. A.R. then told her immediate supervisor, who reported the incident to Teri Fornshell, a manager of the laundry and housekeeping operations. After she reported the incident to her supervisors, A.R. resumed working for the remainder of her shift. When asked why she did not leave for the day, A.R. stated that

she "wanted to finish my work [in order to] [t]ry to get my mind off of things on what had happened. I didn't want to give up." (Tr. Vol. III at 59.)

{¶ 8} On November 7, 2013, Fornshell was in a meeting when she received a call from a housekeeping supervisor indicating that there was an emergency requiring her attention. Fornshell exited the meeting and went to the housekeeping offices where she found A.R., who was visibly upset. A.R. told Fornshell that appellant had inappropriately touched her buttocks and "showed her his male parts through his pants." (Tr. Vol. III at 80.) Fornshell later met with appellant, who was cooperative and denied that the incident occurred. After talking to A.R., Fornshell reported the incident to the hotel's human resources department.

{¶ 9} On May 1, 2014, a Franklin County Grand Jury filed an indictment charging appellant with two counts of gross sexual imposition, in violation of R.C. 2907.05, both felonies of the fourth degree.

{¶ 10} On July 13, 2015, the case proceeded to trial. On the same date, the trial court filed an entry appointing Fatim Dabo as foreign language interpreter in the proceedings; the court also filed a second document signed by Dabo reflecting the oath she swore regarding her duties before the court. On July 14, 2015, the jury returned a verdict of guilty on both counts of the indictment.

{¶ 11} On September 3, 2015, the trial court held a sentencing hearing. On the same date, the trial court filed an entry appointing Fatmata Berete as foreign language interpreter in the proceedings; the court also filed a second document signed by Berete reflecting the oath that was sworn regarding the interpreter's duties before the court. At the sentencing hearing, the trial court imposed a sentence of 16 months on each count of gross sexual imposition, to be served concurrently. The trial court also imposed a 5-year period of postrelease control and classified appellant as a Tier I sexual offender. On October 6, 2015, the trial court filed a judgment entry reflecting appellant's conviction and sentence.

## II.  Assignments of Error

{¶ 12} Appellant appeals and assigns the following four assignments of error for our review:

> [I.] The trial court violated Alimu Barrie's rights to due process and a fair trial when it entered a judgment of guilt against him, when that finding was not supported by sufficient evidence. Fifth and Fourteenth Amendments to the

United States Constitution and Section 16, Article I of the Ohio Constitution.

[II.] The trial court violated Alimu Barrie's rights to due process and a fair trial when it entered a judgment of guilt against him, when that finding was against the manifest weight of the evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

[III.] The trial court violated Alimu Barrie's rights to due process, confrontation of witnesses, and a fair trial when it permitted uncertified and unqualified interpreter to interpret for Mr. Barrie during the legal proceedings against him. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Sections 10 and 16, Article I of the Ohio Constitution; Evid.R. 604 and 702.

[IV.] Alimu Barrie's attorney provided him with the ineffective assistance of counsel and violated his rights to due process and a fair trial where defense counsel failed to object to the court's appointment of uncertified and unqualified interpreters. Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

As appellant's first and second assignments of error are interrelated, we address them together.

## III. Discussion

## A. First and Second Assignments of Error—Manifest Weight and Sufficiency

{¶ 13} In his first and second assignments of error, appellant asserts that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 14} Sufficiency of evidence is a "legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When judging the sufficiency of the evidence to support a criminal conviction, an appellate court must decide if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of

the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 15} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. *See also Thompkins* at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence."). An appellate court must review the entire record, weighing the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175. Thus, although an appellate court acts as a "thirteenth juror" in considering the weight of the evidence, it must give great deference to the factfinder's determination of witness credibility. *State v. Spires*, 10th Dist. No. 10AP-861, 2011-Ohio-3312, ¶ 18, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 22.

{¶ 16} We first consider whether appellant's convictions were supported by sufficient evidence. R.C. 2907.05 provides in pertinent part that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when any of the following applies: (1) The offender purposely compels the other person * * * to submit by force or threat of force." "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). R.C. 2901.22(A) defines the mens rea of purpose: "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

{¶ 17} Appellant contends that plaintiff-appellee, State of Ohio, failed to establish an essential element of the crimes of which he was convicted. Specifically, appellant

contends that "the evidence presented was inadequate to prove that Appellant touched [A.R.'s] erogenous zones for the purpose of sexually arousing or gratifying either person." (Appellant's Brief at 8.)

{¶ 18} "[P]roof of sexual gratification generally must be accomplished by inference rather than by direct evidence." *State v. West*, 10th Dist. No. 06AP-111, 2006-Ohio-6259, ¶ 17. *See also State v. Kring*, 10th Dist. No. 07AP-610, 2008-Ohio-3290, ¶ 37 ("While there must be some evidence of sexual gratification as the purpose for touching a described area, there is no requirement that there be direct testimony as to sexual arousal or gratification."). The trier of fact may infer a purpose of sexual arousal or gratification from the type, nature, and circumstances of the contact, among other relevant factors. *State v. Crosky*, 10th Dist. No. 06AP-655, 2008-Ohio-145, ¶ 47, citing *West* at ¶ 17; *Kring* at ¶ 35.

{¶ 19} Here, A.R. testified that appellant touched her buttocks and breasts, both of which are included in the list of erogenous zones under R.C. 2907.01, thereby supporting the two counts of gross sexual imposition as charged. Both the manner in which appellant touched A.R. and his comments to her demonstrate that appellant touched A.R. for the purpose of sexual arousal or gratification. *Crosky* at ¶ 47; *West* at ¶ 17; *Kring* at ¶ 37. Therefore, viewing the evidence in a light most favorable to the state, we find that a rational trier of fact could have found the essential elements of appellant's crimes proven beyond a reasonable doubt.

{¶ 20} We next examine appellant's contentions with regard to the manifest weight of the evidence. Specifically, appellant contends that A.R. was not credible or that her account was inconsistent because: (1) the other housekeeper on the floor did not testify and Fornshell did not witness the incidents in question; (2) A.R. resumed cleaning the room after the first incident in which appellant touched her; (3) A.R. did not tell the other housekeeper on the floor after the first incident; and (4) it was implausible that the second incident lasted five to ten minutes, as A.R. stated, because that "is an extremely long time to fight off an attacker in a hotel room with an open door." (Appellant's Brief at 12-13.)

{¶ 21} First, it is immaterial that A.R. was the only witness to the incidents in question. "The testimony of a single witness, if believed by the finder of fact, is sufficient to support a criminal conviction." *State v. Booker*, 10th Dist. No. 15AP-42, 2015-Ohio-5118, ¶ 18, citing *State v. Elqatto*, 10th Dist. No. 11AP-914, 2012-Ohio-4303, ¶ 20.

{¶ 22} Next, we disagree that A.R.'s testimony was inherently incredible or otherwise unworthy of belief. However, even if we found that portions of A.R.'s testimony were inconsistent, " '[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.' " *State v. Jackson*, 10th Dist. No. 14AP-670, 2015-Ohio-3322, ¶ 17, quoting *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 9, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. *See also State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 34, citing *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29. A jury may take into consideration a witness's conflicting testimony in determining his or her credibility and the persuasiveness of his or her account by either discounting or resolving the discrepancies. *Jackson* at ¶ 17, citing *Taylor* at ¶ 34. "A jury, as finder of fact, may believe all, part, or none of a witness's testimony." *Taylor* at ¶ 34. *See also Booker* at ¶ 18, citing *State v. Sullivan*, 10th Dist. No. 11AP-414, 2012-Ohio-2737, ¶ 37. Furthermore, not all inconsistent testimony raises serious questions about credibility. *Jackson* at ¶ 17, citing *Taylor* at ¶ 34.

{¶ 23} Here, nothing in A.R.'s account raises serious questions regarding her credibility. Appellant, through his trial counsel, had the opportunity to cross-examine A.R. regarding her account of the incidents. A.R. addressed why she resumed cleaning and did not immediately report the first incident to the other housekeeper or her supervisor; she also explained how the second incident could have lasted for the amount of time she claimed. It was within the province of the jury, as trier of fact, to determine whether or not to believe A.R.'s testimony. Therefore, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot find that the jury, in resolving conflicts in the evidence, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 24} Accordingly, we overrule appellant's first and second assignments of error.

## B. Third Assignment of Error—Interpreter

{¶ 25} In his third assignment of error, appellant asserts the trial court erred by appointing unqualified interpreters both at trial and sentencing.

### 1. Applicable Law and Rules

{¶ 26} R.C. 2311.14(A) provides that "[w]henever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or

communicate, the court shall appoint a qualified interpreter to assist such person." R.C. 2311.14(B) provides in pertinent part that "[b]efore entering upon official duties, the interpreter shall take an oath that the interpreter will make a true interpretation of the proceedings to the party or witness, and that the interpreter will truly repeat the statements made by such party or witness to the court, to the best of the interpreter's ability."

{¶ 27} Evid.R. 604, pertaining to interpreters, states that "[a]n interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." With respect to the oath or affirmation, Evid.R. 603 provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so." Evid.R. 702, relating to the qualification of experts, provides in relevant part as follows:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony[.]

{¶ 28} The Supreme Court of Ohio Rules of Superintendence contain provisions related to the appointment of a foreign language interpreter. Sup.R. 88(A) provides:

> A court shall appoint a foreign language interpreter in a case or court function in either of the following situations:
>
> (1) A party or witness who is limited English proficient or non-English speaking requests a foreign language interpreter and the court determines the services of the interpreter are necessary for the meaningful participation of the party or witness;
>
> (2) Absent a request from a party or witness for a foreign language interpreter, the court concludes the party or witness is limited English proficient or non-English speaking and determines the services of the interpreter are necessary for the meaningful participation of the party or witness.

{¶ 29} When appointing an interpreter as required by Sup.R. 88(A), a court is required to appoint an interpreter in accordance with the requirements of Sup.R. 88(D). Sup.R. 88(D) provides in declining order of requirements a list of the types of interpreters that a court shall appoint.  First, Sup.R. 88(D)(1) provides that "a court *shall* appoint a Supreme Court *certified* foreign language interpreter to participate in-person at the case or court function" subject to the exceptions in Sup.R. 88(D)(2) through (4).  (Emphasis added.)  Second, if a certified foreign language interpreter "does not exist or is not reasonably available to participate in-person at the case or court function and after considering the gravity of the proceedings and whether the matter could be rescheduled to obtain a Supreme Court certified foreign language interpreter * * *, a court may appoint a *provisionally qualified* foreign language interpreter."  (Emphasis added.)  Sup.R. 88(D)(2).  Third, if a certified or provisionally qualified foreign language interpreter does not exist or is not reasonably available to participate in-person, "after considering the gravity of the proceedings and whether the matter could be rescheduled to obtain" a certified or provisionally qualified foreign language interpreter, "a court may appoint a foreign language interpreter who demonstrates to the court proficiency in the target language and sufficient preparation to properly interpret the proceedings."  Sup.R. 88(D)(3).  An interpreter appointed by the court under Sup.R. 88(D)(3) "shall be styled a *'language-skilled* foreign language interpreter.' "  (Emphasis added.)  Sup.R. 88(D)(3).  Finally, if a certified, provisionally qualified, or language-skilled foreign language interpreter does not exist or is not reasonably available to participate in-person, a court may appoint an interpreter to participate in the case through telephonic interpretation. Sup.R. 88(D)(4).

{¶ 30} This court has previously provided guidance regarding interpretation in a court proceeding.  *State v. Newcomb*, 10th Dist. No. 03AP-404, 2004-Ohio-4099, ¶ 29. First, we have stated that "[i]n addition to the execution of a written oath by the interpreter, which should occur prior to the hearing, and subsequent filing with the trial court, the administration of the oath by the trial court to the interpreter should be reflected in the transcript prior to the commencement of the hearing."  *Id.* Second, a "trial court should confirm the interpreter's qualifications and, if necessary, qualify the interpreter as an expert witness." *Id.*  Finally, "the transcript should reflect when the interpreter is interpreting to the defendant and when the defendant is conversing with the interpreter.  The record should reflect [that] all statements made during the hearing were

properly conveyed to the defendant by the interpreter and that the defendant's responses to the interpreter were conveyed to the court." *Id.*

### 2. Standard of Review

{¶ 31} Both at trial and the sentencing hearing, no objection was raised as to the qualifications of the interpreter, the usage of a language-skilled interpreter instead of a certified or provisionally qualified interpreter, or to the ability of the interpreter to effectively interact with appellant. Accordingly, we apply a plain error standard of review. *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 72, citing *State v. McDowall*, 10th Dist. No. 09AP-443, 2009-Ohio-6902, ¶ 26.

{¶ 32} Plain error under Crim.R. 52(B) consists of an obvious error or defect in the trial proceedings that affects a substantial right. *State v. Lindsey*, 87 Ohio St.3d 479, 482 (2000). In order to demonstrate plain error, the defendant must show: (1) an error that is plain on the record, i.e., a deviation from a legal rule that constitutes an obvious defect in the trial proceedings; and (2) that such error affected substantial rights, i.e., there was a reasonable probability that the error affected the outcome of the trial. *State v. J.M.*, 10th Dist. No. 14AP-621, 2015-Ohio-5574, ¶ 27, citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. However, even if a defendant meets the requirements for demonstrating plain error, "an appellate court is not required to correct it," because courts are to "notice plain error with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." (Emphasis omitted; internal quotation marks omitted.) *Rogers* at ¶ 23. *See also State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

### 3. Foreign Language Interpretation at Trial

{¶ 33} We first examine appellant's contentions with regard to the interpreter at trial. It is undisputed that, at trial, the trial court did not appoint a certified or provisionally qualified interpreter, but, rather, appointed a language-skilled interpreter. Pursuant to Sup.R. 88(D)(3), when appointing a language-skilled interpreter, the court is required to "summarize on the record" its efforts to obtain a certified or provisionally qualified foreign language interpreter, in addition to "the reasons for using a language-skilled foreign language interpreter." Furthermore, "[t]he language-skilled foreign language interpreter's experience, knowledge, and training should be stated on the record" and "[e]ach language-skilled foreign language interpreter shall take an oath or affirmation under which the interpreter affirms to know, understand, and act according to

the 'Code of Professional Conduct for Court Interpreters and Translators' as set forth in Appendix H to [the Rules of Superintendence]." Sup.R. 88(D)(3).

{¶ 34} On July 13, 2015, the first day of trial, the trial court addressed the interpreter's qualifications and detailed the process utilized to obtain the interpreter:

> Interpreter, Fatima Dabo, having been heretofore duly sworn, translated the proceedings on behalf of the Court.
>
> * * *
>
> [Appellant's Counsel]: Your Honor, I would like to have the translator explain to my client that she took the oath, which means to accurately interpret.
>
> [The Court]: Ms. Dabo, it's important that you repeat everything that's being said in the courtroom.
>
> * * *
>
> [The Court]: All right. Ms. Dabo, okay, it's extremely important, okay, that everything that's being said in the courtroom, whether it's by me, whether it's by the attorneys and ultimately when we get to the jurors talking, okay, that you repeat everything that's being said in the mic so that [appellant] can hear. Because there were periods of time that I was talking and I didn't hear you.
>
> If you're having difficulty hearing me in any way or if I'm saying something that you don't understand, please, get my attention.
>
> [Ms. Dabo]: Okay.
>
> [The Court]: I'll stop, I'll repeat it, I'll rephrase it. If anyone else in the courtroom is talking and you're having difficulty hearing them, it's important that you let me know as well, and, again, I'll ask that person to talk up so that you can hear.
>
> But the only way that you can interpret accurately is interpreting at the time that someone is talking. Because if you're waiting until that person gets finished and then you try to, what you're going to end up doing is summarizing what was being said as opposed to interpreting directly what's being said at the time that it's being said.
>
> Okay. If you have any questions, please, just stop me and let me know. If there's any confusion it's important that you let me know as well. Okay. But everything that's being said in the courtroom must be interpreted.

So I want you to ask, [appellant], sir, if you have any difficulty understanding what's going on, okay, please get the attention of your attorney * * *.

Do you understand, sir?

[Ms. Dabo]: Yes, he does.

[The Court]: Now, it's important that everything I say, it's important that everything that I say is repeated to [appellant]. Even that. Okay?

[Ms. Dabo]: Okay. Yes.

[The Court]: We are scheduled for trial today. The Court became aware of the need for an interpreter, I believe, it was November -- October, November, 2014.

At that time, the Court worked through the administrative assistant to the court administrator, Sheila Brown, in an effort to obtain an interpreter. First, we had attempted to get an interpreter through, I believe, it was Language Line. Language Line had indicated to the Court that they were not servicing Krio at this time. And there's an email from * * * Language Line on December 10, 2014.

Not being able to obtain an interpreter through Language Line, Sheila Brown contacted Bruno Romero at the Supreme Court. Mr. Romero was able to get us in contact with someone that we could use through a phone conference. And as counsel recalls, we had used an interpreter by the name of John Abeh Fontengwan * * * and we used him for a phone conference. He was with an agency called Cross Thread Solutions. It's either out of Solon, Ohio; but their main office may have been in Baltimore, Maryland. But we used his services for one of the hearings.

Realizing that using the interpreter through a phone conference, while adequate for court hearing, would not be adequate either for a plea hearing or a trial.

So I again got into contact with Sheila Brown who then got into contact with Bruno Romero with the Supreme Court. Mr. Romero checked once again to see if there were any interpreters for Krio, and he checked his sources.

So January 21st, he had provided us names of interpreters, [an interpreter] out of Maryland; [an interpreter] out of Colorado Springs, Colorado; [an interpreter] out of New York;

[an interpreter] out of St. Paul, Minnesota; and [an interpreter] out of New York, New York.

So the Court was trying to figure out at that time what cost potentially would be involved in having to bring someone out for trial.

Bruno Romero with the Supreme Court then got back in contact with the Court indicating that he had made contact with a company out of Cincinnati and the owner was Mr. Ibrahim Amidou.

Mr. Amidou was one of their certification candidates through the Supreme Court. Mr. Amidou provided the interpreters that we have been using.

Now, the interpreters, Ms. Dabo is not a certified interpreter. The Court has had an opportunity to talk with her this morning, had her review the training video from the Supreme Court on expectations for interpreting and we discussed matters such as the confidential nature of conversations between the attorney and client, discussed the importance of her not interjecting her opinion, talked about the importance of not summarizing, and not providing advice; that her role is simply to repeat everything that's being said in court.

The Court does have some concerns, obviously with Ms. Dabo's lack of experience with the legal aspects of interpreting. But based upon the efforts that the Court has made trying to obtain an interpreter that's available to be here for trial, the Court is, at least at this point, willing to move forward with trial using the services of Ms. Dabo.

But the Court will be vigilant and ask that counsel, likewise, if they have any issues or concerns to stop the proceedings so that we can address those concerns.

* * *

[Prosecutor]: Thank you, Judge. Are you saying that there is not a reasonably available certified foreign language interpreter nor a reasonably available provisionally qualified foreign language interpreter; but that Ms. Dabo is a language skilled foreign language interpreter?

[The Court]: Correct.

* * *

[Prosecutor]: Judge, do we need to qualify this interpreter?

The state's willing to stipulate that she is qualified. I don't know what [appellant's counsel's] thoughts are. I think that's a formality that we have to address.

[The Court]: All right. Ms. Dabo, I mean, we did talk briefly in the back. And is it correct this is your first time doing legal interpretation?

[Ms. Dabo]: Yes.

[The Court]: What is your native language?

[Ms. Dabo]: I was born in Sierra Leone. Krio is the native language everybody speaks growing up.

* * *

[The Court]: Okay. And so that's where you learned to speak Krio then?

[Ms. Dabo]: Yes.

[The Court]: Then how did you learn English?

[Ms. Dabo]: It's an English school and when outside of school you can either speak English or Krio. My native background, educational background is in English.

[The Court]: Okay. So what is your educational background?

[Ms. Dabo]: My educational background, I've been to a few colleges. I haven't graduated yet. I want to do business administration and I did some computer networking and human resources classes.

[The Court]: In what settings have you interpreted in the past?

[Ms. Dabo]: In business settings, like in purchasing something from the school.

[The Court]: Okay. Now, are you related in any way with any of the participants in this case?

[Ms. Dabo]: No.

[The Court]: Do you know [appellant] at all?

[Ms. Dabo]: No. Today is the first day I saw him.

[The Court]: Okay. And at least based upon what you know, not familiar with any of his relatives or anything like that?

[Ms. Dabo]: No.

* * *

[The Court]: All right. As we are moving through the trial and if it appears that you are familiar with any of the participants, please, let me know.

Now, do you understand that you are to be a neutral party here to facilitate communication?

[Ms. Dabo]: Yes.

[The Court]: And that you should not offer advice or interject your opinion into these proceedings?

[Ms. Dabo]: Yes.

[The Court]: You understand that?

[Ms. Dabo]: Yeah.

[The Court]: What training have you done, if any, with regard to interpreting in the past?

[Ms. Dabo]: Nothing.

[The Court]: How have you worked with Mr. Amidou?

[Ms. Dabo]: I just came to introduce myself that I would be taking over for the person and then I came in and talked.

[The Court]: You're familiar with Mr. Amidou's company or was it just --

[Ms. Dabo]: Yeah. I am familiar with the company Language International as far as what they do.

[The Court]: Okay. All right. I'm going to qualify you as an interpreter. I mean, we understand, again, some of the limitations that we have in these proceedings. But I think it's very important that you stop us if there's something that you do not understand; that you'd be willing to ask us questions if you need something restated or repeated; and then, again, just making sure that you're interpreting everything that's being said without interjecting your opinion without summarizing or without providing advice.

[Ms. Dabo]: Correct.

[The Court]: Okay. So on behalf of the State then?

[Prosecutor]: Does [appellant's counsel] have any objections to this interpreter being qualified?

[Appellant's counsel]: No, Your Honor.

What I'd like to do, just briefly, since we are on the record is ask my client, are you able to understand the translator, the interpreter?

[Ms. Dabo]: Yes.

[Appellant's Counsel]: Do you have any difficulties today?

[The Court]: You have to say yes or no.

[Ms. Dabo]: You can say yes or no.

[Appellant]: Yes. Yes.

[Ms. Dabo]: Do you have any difficulty right now?

[Appellant]: No. No.

[The Court]: It's my understand, at least having a conversation this morning, is that there is some, I guess, part of Krio that is English as well.

[Ms. Dabo]: Yes. It's like a broken English.

[The Court]: Okay. All right. So with regard to the interpreter, anything else that we need to place on the record on behalf of either party?

[Prosecutor]: No.

[Appellant's counsel]: No.

(July 13, 2015 Tr. at 3-16.)

{¶ 35} On July 13, 2015, the trial court filed a document titled "Oath" which was signed by the interpreter and stated: "I do solemnly swear that I will make a true interpretation of the proceedings to the party or witness, and that I will truly repeat the statements made by such party or witness to the Court, to the best of my ability." Additionally, the transcript reflects that the interpreter was sworn before the court. Here, both the signed statement by the interpreter and the transcript of proceedings before the

court reflect that Dabo was sworn as an interpreter.  Additionally, appellant's counsel asked the court to instruct the interpreter to explain to appellant that "she took the oath, which means to accurately interpret."  (July 13, 2015 Tr. at 3.)

{¶ 36} Appellant first contends that the trial court erred in appointing Dabo as his interpreter because the trial court did not qualify her as an expert witness in contravention of this court's holding in *Newcomb*.  However, in *Newcomb*, we stated that "[t]he failure to object in the trial court results in a waiver of the requirements to administer an oath to the interpreter and to qualify the interpreter as an expert witness." *Id.* at ¶ 22.  Furthermore, we stated that "the alleged failure to qualify the interpreter as an expert witness does not constitute plain error" because "[t]here is no evidence which indicates the interpreter was not qualified to interpret." *Id.* at ¶ 25.  Therefore, we concluded that "the fact the interpreter was not qualified as an expert witness does not undermine or call into question the fairness, integrity, or public reputation of appellant's plea." *Id.*

{¶ 37} Here, as in *Newcomb*, there is no evidence that the interpreter was not qualified to interpret. Although appellant notes the trial court "had to instruct [the interpreter] several times before the trial began to interpret literally and not to summarize," appellant fails to demonstrate with reference to the record that the interpreter was not qualified to interpret or was inaccurately interpreting.  (Appellant's Brief at 18.)    Furthermore, the trial court conducted a lengthy colloquy with the interpreter on the record, inquiring into subjects including the interpreter's educational background, familiarity with the subject language, and experience interpreting, among others.   Thereafter, the trial court qualified Dabo as an interpreter.   The trial court cautioned the interpreter that "it's very important that you stop us if there's something that you do not understand; that you'd be willing to ask us questions if you need something restated or repeated; and then, again, just making sure that you're interpreting everything that's being said without interjecting your opinion without summarizing or without providing advice." (July 13, 2015 Tr. at 14.)

{¶ 38} The trial court specifically asked appellant's counsel whether there was any objection to the qualification of the interpreter.  Appellant's counsel did not object at that time or at any other time during the proceedings.  We do not find any error.  However, assuming, arguendo, there was error, appellant cannot show that any alleged error related

to the trial court's qualification of the interpreter affected the outcome of the trial. Appellant fails to demonstrate plain error.

{¶ 39} Next, appellant contends that the trial court should have delayed appellant's trial "until a certified translator could be found." (Appellant's Brief at 22.) However, neither R.C. 2311.14 nor the Rules of Superintendence require that a court continue a trial until a certified interpreter can be appointed. Indeed, as we have previously stated, the Rules of Superintendence specifically allow for the appointment of a language skilled interpreter when the trial court ascertains that a certified or provisionally qualified foreign language interpreter is "not reasonably available to participate in person." Sup.R. 88(D)(3). Here, the trial court detailed its efforts to obtain a certified interpreter, including seeking the assistance of the Supreme Court. Appellant has failed to demonstrate plain error resulting from the trial court's usage of a language-skilled interpreter.

{¶ 40} Accordingly, we find that the trial court did not err in appointing Dabo as a language-skilled foreign language interpreter at appellant's trial.

**4. Foreign Language Interpretation at Sentencing Hearing**

{¶ 41} Finally, we consider appellant's contentions with regard to the foreign language interpreter at the sentencing hearing on September 3, 2015. The record reflects that on the day of the hearing, the trial court filed an entry stating: "Pursuant to section 2311.14, Ohio Revised Code, Fatmata Berete is hereby appointed interpreter in this action." Additionally, the trial court filed a document titled "Oath" which was signed by the interpreter and stated: "I do solemnly swear that I will make a true interpretation of the proceedings to the party or witness, and that I will truly repeat the statements made by such party or witness to the Court, to the best of my ability." However, the record does not reflect whether the interpreter was a certified, provisionally qualified, or language skilled interpreter. The record also does not reflect that the trial court inquired as to the qualifications of the interpreter.

{¶ 42} Here, we find that appellant has failed to demonstrate plain error for several reasons. First, in a plain error analysis, the sentencing hearing is procedurally distinct from the trial phase of the proceedings since concerns related to the adversarial process are not present at sentencing. *See State v. Dunbar*, 3d Dist. No. 1-92-12 (Nov. 5, 1992). Additionally, there is no indication, and appellant does not contend, that a more qualified interpreter was reasonably available at the time of sentencing, especially considering the

lack of a reasonably available certified or provisionally qualified interpreter at trial. Therefore, under these circumstances, appellant is unable to establish that the outcome of the proceedings would have been different absent the alleged error.

{¶ 43} Notwithstanding the foregoing analysis, we find that better practices could be employed at the sentencing hearing, as in other phases of the proceedings. Although not outcome determinative, the sentencing proceeding entails the communication of important obligations and responsibilities for the convicted defendant. *See generally State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238. Here, the trial court informed the defendant of community control notification and registration obligations imposed as a result of his classification as a Tier I sexual offender. In light of these considerations, it is important for a trial court to comply with Sup.R. 88 at the sentencing hearing, as in other phases of the proceedings. Thus, where, as here, if an interpreter at sentencing is different from the interpreter who was qualified at trial, the trial court should inquire on the record of sentencing as to the qualifications of the interpreter.

{¶ 44} In conclusion, we find appellant has failed to demonstrate plain error with regard to the trial court's appointment of interpreters at trial and the sentencing hearing.

{¶ 45} Accordingly, we overrule appellant's third assignment of error.

## C. Fourth Assignment of Error—Effective Assistance of Counsel

{¶ 46} In his fourth assignment of error, appellant asserts he received ineffective assistance of counsel because his trial counsel failed to object to the interpreters provided during the trial and sentencing proceedings.

{¶ 47} A convicted defendant alleging ineffective assistance of counsel must demonstrate that: (1) defense counsel's performance was so deficient that he or she was not functioning as the counsel guaranteed under the Sixth Amendment to the United States Constitution; and (2) defense counsel's errors prejudiced defendant, depriving him or her of a trial whose result is reliable. *State v. Campbell*, 10th Dist. No. 03AP-147, 2003-Ohio-6305, ¶ 24, citing *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.

{¶ 48} "Judicial scrutiny of counsel's performance must be highly deferential * * * [and a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689; *Bradley* at 141. In Ohio, a properly licensed attorney is presumed competent. *State v. Davis*, 10th Dist. No. 13AP-98, 2014-Ohio-90, ¶ 20, citing *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 301 (1965).

Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). " 'To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' " *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *Bradley* at paragraph three of the syllabus.

{¶ 49} Here, appellant recasts his fourth assignment of error as an ineffective assistance of counsel claim. *State v. Carse*, 10th Dist. No. 09AP-932, 2010-Ohio-4513, ¶ 78, citing *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 233. However, appellant fails to demonstrate that there exists a reasonable probability that, but for trial counsel's failure to object, the result of the trial would have been different. *Hale* at ¶ 233, quoting *State v. Holloway*, 33 Ohio St.3d 239, 244 (1988) (finding that " '[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel' "). Appellant fails to point to evidence in the record demonstrating that he was unable to understand his interpreters. Furthermore, appellant's trial counsel specifically asked appellant whether he was able to understand the interpreter at trial, and appellant agreed that he had no difficulties understanding the interpreter. Therefore, based on our review of the record, we cannot find that appellant's trial counsel's failure to object rendered his performance so deficient that he was not functioning as the counsel guaranteed under the Sixth Amendment to the United States Constitution or that such performance prejudiced appellant.

{¶ 50} Accordingly, we overrule appellant's fourth assignment of error.

## IV. Conclusion

{¶ 51} Having overruled appellant's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.

_____