**[Cite as *State v. Louis*, 2020-Ohio-951.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27909 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3501 |
| | : | |
| JEAN BRUNEL PIERRE LOUIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of March, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, 545 Metro Place South, Suite 100, Dublin, Ohio 43017
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Jean Brunel Pierre Louis appeals from his conviction for kidnapping and gross sexual imposition. Louis contends he was denied a fair trial because the State provided an unqualified interpreter at trial.[1] He further contends trial counsel was ineffective. Louis also claims the State did not present evidence sufficient to sustain the conviction for kidnapping and that the conviction was against the manifest weight of the evidence. Finally, Louis contends the trial court should have merged the offenses for sentencing.

{¶ 2} We conclude Louis has failed to demonstrate that the interpreter used at trial was unqualified or that trial counsel was ineffective. We further conclude the State's evidence was sufficient to support the conviction for kidnapping and that the conviction was not against the manifest weight of the evidence. However, we agree that the trial court erred in failing to merge the kidnapping and gross sexual imposition offenses.

{¶ 3} Accordingly, the judgment of the trial court is reversed in part and remanded to the trial court for merger of the kidnapping and gross sexual imposition convictions and resentencing thereon. The judgment of the trial court is otherwise affirmed.

## I.      Facts and Procedural History

{¶ 4} On November 17, 2016, Louis was indicted on one count of rape (force or threat of force) in violation of R.C. 2907.02(A)(2), one count of kidnapping (sexual activity) in violation of R.C. 2905.01(A)(4), and one count of gross sexual imposition (force) in violation of R.C. 2907.05(A)(1). The matter proceeded to trial in July 2017. At the

---

[1] We note that appellate counsel refers to appellant as "Pierre-Louis." However, trial counsel referred to him as "Mr. Louis" throughout the course of the proceedings below. Thus, we will refer to appellant as "Louis."

conclusion of the trial, the jury acquitted Louis of the charge of rape, but the jury was unable to reach a verdict regarding the counts of gross sexual imposition and kidnapping. Louis was released from custody on a conditional own recognizance bond.

{¶ 5} A second jury trial commenced in January 2018. The State's evidence was as follows:

{¶ 6} The State presented the testimony of N.M., who testified that in June 2016, she moved with her mother and brother from Maryland to Dayton.  When they initially arrived in Dayton, they stayed at Louis's home along with Louis and his wife, their four children, and Louis's mother-in-law.  N.M., age 15, and her mother slept in the living room on a blow-up mattress.  She testified that the household was so large and noisy that she began going to the basement where it was quiet.  She also testified that she liked to use the mirror in the basement when she was braiding her hair.

{¶ 7} N.M. testified that on October 22, 2016, she was in the basement braiding her hair when Louis came down to work out.  She testified that she began to gather her things to return upstairs when Louis told her she could stay and finish her hair.  N.M. testified that Louis turned on some music and began his workout.  According to N.M., she was familiar with the music, which she described as Haitian and of a sexual nature. N.M. testified that when she began to sing along with the music, Louis began to say, "I know you know how to dance to these kind of songs * * * because I've seen you like dance to it."  Tr. p. 189.  She testified that he then asked her to dance with him.  N.M. testified that she declined because "those kind of dances, like, it's just too close too, too personal [and she did not] want to dance like that."  *Id.*  N.M. testified that Louis continued to ask her to dance and stated that they could stand apart from each other.

{¶ 8} N.M. testified that she acquiesced, and when she began to dance, Louis immediately grabbed her and pulled her toward him so that their chests were touching. She testified Louis had an arm around her waist, and his grip was so strong she could not get away from him. She also testified that the arm around her waist slid down to her buttocks and that he put his other hand under her shirt. N.M. testified Louis touched her breast with his mouth and hand and that his other hand began to slip inside her pants.

{¶ 9} N.M. testified Louis's mother-in-law, Viviane Hubert, began to climb down the stairs into the basement, and Louis, at this point, pushed N.M. away from him. She testified that Hubert was in the basement for a few minutes speaking to Louis before heading back up the stairs. N.M. testified she started to leave behind Hubert, but that Louis grabbed her by the wrist, pulled her back to him, and stated he "wasn't done with [her]." Tr. p. 205. N.M. testified that Louis again wrapped an arm around her waist and then used his other hand to put her hand on his penis. She testified his pants were pulled down just below his penis. N.M. testified Louis instructed her to stroke his penis and that she complied until he ejaculated. She testified Louis then hugged and thanked her, and he pulled her in toward him and down onto a couch. She testified that her phone began to ring, that she pretended her mother was calling, and she took that opportunity to retreat up the stairs.

{¶ 10} N.M. admitted she did not inform anyone about the incident until the next day when she spoke with an aunt who lived in New York. A few days later, N.M. and her family moved into their own apartment in Dayton and thereafter, the police were called. On cross-examination, N.M. admitted that she was very unhappy with the move to Ohio and wanted to return to Maryland. N.M. also admitted she did not like Louis's wife

because she had broken N.M.'s computer tablet and had also called the police regarding N.M.'s behavior.

{¶ 11} The State also introduced into evidence the clothing N.M. was wearing during the encounter, which had been collected by the police and submitted for DNA testing. The DNA results indicated Louis's semen was on N.M.'s pants.

{¶ 12} Hubert testified on Louis's behalf. She testified that during the four months N.M. lived in the house, Louis had never talked to N.M. Hubert also testified that she had never seen N.M. and Louis standing together in the basement. Hubert testified that N.M. was unhappy. On cross-examination, Hubert reiterated her testimony that she never saw Louis and N.M. interact with each other. Finally, Hubert testified that on October 22, 2016, she saw N.M. in the basement but Louis was in his own room at the time.

{¶ 13} Louis's wife, Katty, also testified at trial. She testified that she had been married to Louis for four years, that Louis had been in the United States for almost five years, and that he had worked for two different companies during that time. She testified that she and Louis offered N.M. and her family a place to stay in Dayton, and the family lived with them for approximately four months. Katty testified that in July 2016, she had to leave work early in order to give N.M. a ride home. Katty testified that, during the ride, N.M. was cussing and indicated she was not happy living in Dayton. Katty also indicated that she had to call the police regarding N.M. She testified there were numerous mirrors in her home, including in the living room, which N.M. could have used instead of the one in the basement.

{¶ 14} Following trial, Louis was convicted on both of the remaining counts. The

trial court noted on the record that Louis had requested merger of the counts for the purpose of sentencing. However, the trial court denied the request. Thereafter, the court imposed a five-year prison term on the kidnapping conviction and an 18-month prison term on the gross sexual imposition conviction. The sentences were ordered to run concurrently. Additionally, the trial court designated Louis as both a Tier I and Tier III sex offender. Louis appeals.

## II.    Interpreter Analysis

{¶ 15} Louis's first assignment of error is as follows:

PIERRE-LOUIS WAS DENIED HIS RIGHT TO A FAIR TRIAL, HIS RIGHT TO EQUAL PROTECTION, AND HIS RIGHT TO CONFRONT THE ONLY WITNESS AGAINST HIM THROUGH THE USE OF UNQUALIFIED INTERPRETERS.

{¶ 16} Louis claims the interpreter assigned by the trial court to assist him was not certified or otherwise qualified, and that he was thus denied a fair trial. He makes the same claim regarding the interpreter assigned to N.M.[2]

{¶ 17} Courts in Ohio have held that a defendant with limited use of the English language is entitled to an interpreter. This right was explained in *Columbus v. Lopez-Antonio*, 153 Ohio Misc.2d 4, 2009-Ohio-4892, 914 N.E.2d 464 (M.C.):

---

[2] While both the State and Louis indicate N.M. testified through an interpreter, we note the transcript indicates otherwise. Specifically, during N.M.'s testimony, the trial court continuously instructed her to raise her voice because she was difficult to hear. Further, there is no indication in the record that an interpreter was assigned to assist her. Because of this discrepancy, we have reviewed the actual recording of the trial and note that N.M. fluently testified in English. Thus, any argument regarding her interpreter lacks merit.

The fundamental right to due process accorded to criminal defendants by the Fifth and Fourteenth Amendments is compromised when a defendant who is limited-English proficient ("LEP") is not provided an interpreter. "The failure to ensure that non-English speaking defendants are given the same opportunity as others to be present, to speak in their defense and to understand what is taking place, in whatever language they possess, reaches constitutional proportions." Such failure amounts to denial of equal treatment and of due process.

* * *

The Sixth Amendment rights to confrontation and effective assistance of counsel are violated when an LEP defendant does not understand the testimony offered against him and is unable to properly confer with his attorney.

(Footnote omitted.) *Id.* at ¶ 3-4.

{¶ 18} Sup.R. 88(A) provides that a court must appoint a foreign language interpreter when (1) requested by a party who is non-English speaking or has limited English proficiency and, (2) "the court determines the services of an interpreter are necessary for the meaningful participation of the party." "Sup.R. 88(D) provides, in declining order of requirements[,] a list of the types of interpreters that a court shall appoint." *State v. Barrie*, 2016-Ohio-5640, 70 N.E.3d 1093, ¶ 29 (10th Dist.). When an interpreter is required, Sup.R 88(D)(1) requires the court to appoint "a Supreme Court certified foreign language interpreter." If such "does not exist or is not reasonably available and after considering the gravity of the proceedings and whether the matter

could be rescheduled to obtain a Supreme Court certified foreign language interpreter, a court may appoint a provisionally qualified foreign language interpreter." Sup.R. 88(D)(2). Finally, if a Supreme Court certified foreign language interpreter or provisionally qualified foreign language interpreter "does not exist or is not reasonably available to participate in-person at the case or court function and after considering the gravity of the proceedings and whether the matter could be rescheduled to obtain a Supreme Court certified foreign language interpreter or provisionally qualified foreign language interpreter * * *, a court may appoint a foreign language interpreter who demonstrates to the court proficiency in the target language and sufficient preparation to properly interpret the proceedings * * *. Such interpreter shall be styled a 'language-skilled foreign language interpreter.' " Sup.R. 88(D)(3).

{¶ 19} When a language-skilled foreign language interpreter is appointed, the trial court must "summarize on the record" its efforts to obtain a certified or provisionally qualified foreign language interpreter to participate in the proceedings and "the reasons for using a language-skilled foreign language interpreter." Also, "[t]he language-skilled foreign language interpreter's experience, knowledge, and training should be stated on the record," and the interpreter should be sworn in on the record. Sup.R. 88(D)(3).

{¶ 20} Here, the trial court detailed its efforts to obtain a Haitian-Creole certified interpreter. The Court noted it had utilized the Supreme Court of Ohio certified interpreter list, as well as local agencies and companies, in its search for an interpreter. The trial court also utilized a company in Indiana specializing in providing interpreters. The trial court noted that the search revealed there are no Haitian-Creole certified interpreters in Ohio.

{¶ 21} The court was eventually able to secure the services of Vanessa Lager to act as an interpreter. Because she was not certified or provisionally qualified, the trial court conducted a voir dire into Lager's qualifications. Lager testified that her parents were Haitian, that her native languages were Creole and French, and that the primary language in her childhood household was Haitian-Creole. She testified that she learned to speak English in school. She had an associate degree and was a licensed practical nurse. Lager testified she had been training with and shadowing court interpreters but she had not previously interpreted during a criminal trial; she had been in court and had become familiar with legal terminology. Lager testified that, for several years, she had been translating in the medical field for the local Haitian community, and she also had worked with the Department of Job and Family services helping people apply for government services. Lager indicated she had spent time with Louis and had no hesitation about her ability to translate for him. Based upon its examination, the trial court qualified Lager as a Haitian-Creole interpreter.

{¶ 22} Louis has not demonstrated that Lager was not qualified to interpret or that she was inaccurately interpreting. Indeed, Louis indicated he met with Lager and was very comfortable using her as his interpreter. Moreover, the trial court conducted a lengthy colloquy with Lager on the record, inquiring into subjects including her educational background, familiarity with the subject language, and experience interpreting. The trial court informed her that if, during the trial, anything occurred that she did not understand or if she needed anything restated or repeated, she should so inform the court. The record shows N.M. testified in a very soft-spoken manner, making it difficult to hear her, and that, consistent with the trial court's instruction, Lager requested on several occasions

that N.M. repeat her testimony.

{¶ 23} We find no merit in Louis's argument regarding Lager's qualifications to act as an interpreter. Also, there is nothing in the record to indicate that Lager interpreted inaccurately.[3] Louis's first assignment of error is overruled.

### III. Ineffective Assistance of Counsel/Speedy Trial Analysis

{¶ 24} Louis's second assignment of error states:

IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL FOR PIERRE-LOUIS'S TRIAL COUNSEL NOT TO MOVE FOR DISMISSAL ON SPEEDY TRIAL GROUNDS, BECAUSE THE STATE VIOLATED HIS RIGHT TO A SPEEDY TRIAL.

{¶ 25} Under this assignment of error, Louis contends trial counsel rendered ineffective assistance by failing to raise a claim that the State violated his right to a speedy trial.

{¶ 26} "Claims of ineffective assistance of trial counsel are reviewed under the analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d

---

[3] Louis's argument, citing to Sup.R. 88(F), that the trial court had a mandatory obligation to appoint at least two interpreters is unavailing. Sup.R. 88(F) does state that a court, to ensure an accurate interpretation, shall appoint at least two interpreters when "[t]he case or court function will last two or more hours and require continuous, simultaneous, or consecutive interpretation." Sup.R. 88(F)(1)(a). In consideration of this language, the trial court stated during the hearing resulting in Lager's appointment that all trial sessions would be between 60 and 90 minutes, after which the court would take a 10 to 15 minute break. The record reflects adherence to this schedule, and, as discussed, the record does not support a conclusion that Lager's interpretation was inaccurate. Also, the Rules of Superintendence are "administrative directives" that do not "function as rules of practice and procedure," and, as such, do not "create any individual rights." *In re S.B.*, 2d Dist. Greene Nos. 2014-CA-19, 2014-CA-20, 2014-Ohio-4710, ¶ 86, quoting *Pettit v. Pettit*, 12th Dist. Fayette No. CA2011-08-018, 2012-Ohio-1801, ¶ 12. (Other citations omitted.)

674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989)." *State v. Sewell*, 2d Dist. Montgomery No. 27562, 2018-Ohio-2027, ¶ 63. "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id.*, quoting *Bradley* at paragraph two of the syllabus. In order to establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*, quoting *Bradley* at paragraph three of the syllabus.

{¶ 27} The sole issue before us relates to whether counsel improperly failed to make a claim that Louis's right to a speedy trial was violated.

{¶ 28} The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution. This constitutional mandate was codified in Ohio by the enactment of R.C. 2945.71, which designates specific time limits for bringing a defendant to trial. A defendant charged with a felony must be brought to trial within 270 days of arrest. R.C. 2945.71(C)(2). Each day that the defendant is held in jail in lieu of bail counts as three days in computing this time. R.C. 2945.71(E). The time may be tolled by certain events delineated in R.C. 2945.72(C), (E) and (H), including continuances granted as a result of defense motions and any reasonable continuance granted other than upon the request of the accused. Compliance with these statutes is mandatory and the statutes "must be strictly construed against the state." *State v. Cox*, 12th Dist. Clermont No. CA2008-03-028, 2009-Ohio-928, ¶ 12.

{¶ 29} Louis was charged with three felony offenses. Thus, R.C. 2945.71 required the State to bring him to trial within 270 days of his arrest. Further, Louis was in jail on the pending charges, thereby triggering the triple-count provision of the statute. The parties do not dispute that the time began to run on November 17, 2016, when Louis was arrested. Our review of the record shows that Louis executed a limited time waiver on December 21, 2016. That waiver extended to February 28, 2017. On January 25, 2017, during the pendency of the waiver period, Louis filed a motion to suppress. He also filed a supplemental motion to suppress on June 9, 2017. The motion to suppress was denied on July 5, 2017 and the trial commenced on July 10, 2017.

{¶ 30} As of the commencement of trial, Louis had spent 708 days in jail under the triple-count provision. However, 588 of those days were chargeable to him for speedy-trial purposes. Based upon this record, he was entitled to 105 days of speedy-trial time under the triple-count provision for the period from his arrest until he filed a waiver and the motion to suppress. He was entitled to another 15 days for the time that passed between the denial of the suppression motion and the commencement of the trial. Thus, the State did not violate the right to a speedy trial, as Louis was brought to trial for the first time within 120 days.

{¶ 31} We turn next to the time period between the first and second trials. The Ohio Supreme Court has held that the provisions of R.C. 2945.71 are not applicable to retrials. *State v. Fanning*, 1 Ohio St.3d 19, 21, 437 N.E.2d 583 (1982). The Court stated that "[i]t is noteworthy that the statute does not include any reference whatever to retrials. The standard to be applied, therefore, is basically reasonableness under federal and state constitutions." *Id.*

**{¶ 32}** The reasonableness standard under the constitutional right requires a four-factor analysis: the length of the delay, the reason for the delay, whether the defendant requested a speedy trial, and whether he or she was prejudiced by the delay. *State v. Branch*, 9 Ohio App.3d 160, 162, 458 N.E.2d 1287 (8th Dist.1983), citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**{¶ 33}** Having reviewed the record, we note that the verdict entry of a mistrial on the charges of gross sexual imposition and kidnapping was entered on July 18, 2017. At that time, Louis was released on his own recognizance. A scheduling conference was held on September 14, 2017, at which time trial was set for January 8, 2018. A final pretrial was conducted on December 15, 2017. The trial, which commenced as scheduled, occurred within 172 days of the entry of the verdict in the first trial.

**{¶ 34}** The record demonstrates that the victim and her family had moved back to Maryland; thus, the State had to make arrangements for her travel back to Ohio. Additionally, Louis admits there were problems in obtaining interpreters for trial. Although he claims that counsel was ineffective for failing to make a speedy trial claim during this period, we note that the record demonstrates that Louis was out of jail during the period between the trials and that he faced the potential of deportation if convicted. He was also working in order to support his family during this time. Thus, it is entirely possible that counsel did not press the issue at Louis's own request.[4] Therefore, while the delay in bringing Louis to retrial was somewhat lengthy, we are not persuaded that the delay was constitutionally unreasonable. Nor can we say that trial counsel was

---

[4] Having previously signed a speedy trial time waiver, Louis was certainly aware of his right to a speedy trial.

deficient for failing to raise the issue.

**{¶ 35}** The second assignment of error is overruled.

### IV. Sufficiency and Manifest Weight of the Evidence Analysis

**{¶ 36}** The third and fourth assignments of error asserted by Louis state:

THE STATE'S EVIDENCE AGAINST PIERRE-LOUIS OF KIDNAPPING IS

LEGALLY INSUFFICIENT AS A MATTER OF LAW.

THE EVIDENCE WEIGHS MANIFESTLY AGAINST CONVICTING

PIERRE-LOUIS OF KIDNAPPING.

**{¶ 37}** Louis contends the State did not present evidence sufficient to sustain the conviction for kidnapping and that the conviction was not supported by the manifest weight of the evidence.

**{¶ 38}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In reviewing such an argument, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence

to support a criminal conviction is to examine the evidence admitted at trial

to determine whether such evidence, if believed, would convince the

average mind of the defendant's guilt beyond a reasonable doubt. The

relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

**{¶ 39}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this type of review, a " 'court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 40}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). Therefore, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, 2005 WL 1055819, ¶ 15.

**{¶ 41}** R.C. 2905.01(A)(4) sets forth the elements of kidnapping as: "[n]o person,

by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will."   Sexual activity is defined as "sexual conduct or sexual contact, or both."   R.C. 2971.01(C).   Sexual contact includes "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."   R.C. 2907.01(B).

{¶ 42} Louis argues that the State "did not demonstrate 'removal' or 'restraint,' because under the statute, the State must prove that Pierre-Louis 'removed' or 'restrained' N.M. such that she was 'beyond immediate help' as described in the Kidnapping statute's commentary[.]"   The portion of the commentary upon which Louis relies states:

> An offense under this section does not depend on the distance the victim is removed or the manner in which he is restrained.   Rather it depends on whether the removal or restraint is such as to place the victim in the offender's power and beyond immediate help, even though temporarily.   Thus, removal of the victim may be for only a short distance, such as from one car to another.   Also, the restraint involved need not be actual confinement, but may be merely compelling the victim to stay where [she] is.

(Citation omitted.)

{¶ 43} The testimony reveals that Louis grabbed N.M. firmly by the wrist and pulled her to him when she attempted to exit the basement with Hubert.   He then kept an arm

around her so that she was unable to get away from him. Thus, a jury could have reasonably found both removal, based upon N.M.'s attempt to leave the basement, as well as restraint. Further, the testimony revealed that while he had her so restrained, Louis used his hand to place N.M.'s hand on his penis. Thus, the jury could have reasonably found that the removal and restraint were for the purpose "to engage in sexual activity."

{¶ 44} Louis argues that this evidence is insufficient because it does not demonstrate N.M. was beyond immediate help. He notes that other people were in the house during the commission of the offense, and that N.M. did not yell for help. He also notes that she did not ask for help when Hubert came into the basement.

{¶ 45} We have not found, nor has Louis cited, any statutory or case law definition of the phrase "beyond immediate help." Likewise, we have not found any authority for the claim that a minor victim must seek help during the commission of an offense. At the time of the offense, N.M. was 15 years old and living as a guest in Louis's home. Louis was 49 at the time. N.M. was of slight build, five feet three inches tall and weighing only 115 to 120 pounds, while Louis, who lifted weights every day, was approximately a foot taller. N.M.'s testimony indicated that when Hubert was in the basement, N.M. did not say anything to her because she was "lost," or "wasn't there mentally," because she was trying to understand what had just happened to her. She also testified that she did not know Hubert well enough to say anything to her. Further, there was no evidence that anyone would have been able to hear her even if she had yelled while in the basement.

{¶ 46} We cannot conclude that N.M.'s failure to seek help rendered the evidence insufficient to sustain a conviction for kidnapping.

{¶ 47} Louis also claims that the kidnapping conviction was not supported by the weight of the evidence. His argument in this regard centers on the claim that his evidence was "more believable and persuasive."

{¶ 48} We note that Louis's trial strategy centered upon the claim that N.M. was not credible. Both his attorney's closing argument, and the testimony of his wife and her mother attempted to portray N.M. as a very unhappy, troubled teen forced to live in Dayton who fabricated the offense as a means to enable her to move back to Maryland.

{¶ 49} "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The testimony of a single witness, if believed by the finder of fact, is sufficient to support a criminal conviction." *State v. Barrie*, 10th Dist. Franklin No. 15AP-848, 2016-Ohio-5640, ¶ 21, quoting *State v. Booker*, 10th Dist. Franklin No. 15AP-42, 2015-Ohio-5118, ¶ 18.

{¶ 50} The jury was free to disregard the testimony and argument presented by Louis and to give more credence to the evidence presented by the State. Further, we find nothing inherently incredible in N.M.'s testimony. Therefore, we cannot conclude that this is the exceptional case in which the jury clearly lost its way and created a manifest miscarriage of justice.

{¶ 51} The third and fourth assignments of error are overruled.

## V.     Merger Analysis

**{¶ 52}** Louis's fifth assignment of error is as follows:

PIERRE-LOUIS'S KIDNAPPING AND GROSS SEXUAL IMPOSITION

COUNTS SHOULD HAVE BEEN MERGED.

**{¶ 53}** In this assignment of error, Louis argues that the trial court erred when it did not merge his offenses of kidnapping and gross sexual imposition for sentencing.   We agree.

**{¶ 54}** The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 10, protect a defendant against multiple punishments for the same offense.   *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 7.   In Ohio, this constitutional protection is codified at R.C. 2941.25.   R.C. 2941.25(A) provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."   The statute further provides that "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."   R.C. 2941.25(B).

**{¶ 55}** In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court clarified this statutory standard and held that if a defendant's conduct

supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows the offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus, citing R.C. 2941.25(B). Two or more offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶ 56} Additionally, the Supreme Court of Ohio has acknowledged that "implicit within every forcible rape * * * is a kidnapping" because the victim's liberty is restrained during the act of forcible rape. *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979). The same logic applies to gross sexual imposition and kidnapping. *State v. Sarr*, 2d Dist. Montgomery No. 28187, 2019-Ohio-3398. In *Logan*, the court provided the following guidelines for determining whether kidnapping and another offense of the same or similar kind were committed with a separate animus:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a

substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.

{¶ 57} Even though *Logan* predates *Ruff*, this court and others continue to apply the guidelines set forth in *Logan* in determining whether kidnapping and another offense were committed with a separate animus, in accordance with the third prong of the *Ruff* test. *State v. Mpanurwa*, 2017-Ohio-8911, 102 N.E.3d 66, ¶ 22 (2d Dist.).

{¶ 58} "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 59} As stated previously, kidnapping as charged in this case involves the use of force to restrain the liberty of another in order to engage in sexual activity. Sexual activity is defined to include sexual contact. Gross sexual imposition also involves the use of force to compel another person to have sexual contact with another.

{¶ 60} The State maintains that the gross sexual imposition was completed prior to the kidnapping. Specifically, the State argues that the gross sexual imposition occurred when Louis held N.M. to him and touched her breast with his mouth and hand, and that it was complete before Hubert entered the basement. The State further argues that the kidnapping occurred when Louis subsequently restrained N.M. to prevent her from leaving the basement. The State argues that he restrained her in order to again sexually assault her. Finally, the State contends that Hubert's "interruption was an intervening event which separated the offense of" gross sexual imposition from the

kidnapping.

{¶ 61} We find the State's argument disingenuous. In the bill of particulars, the State identified the kidnapping as beginning when Louis restrained N.M. by grabbing her arm and preventing her from leaving the basement with Hubert. It identified the gross sexual imposition as occurring when Louis forced N.M. to touch his penis. Obviously, the touching of the penis occurred immediately after the identified kidnapping. Thus, in reliance on the bill of particulars as provided by the State to Louis prior to trial, we resolve the issue in Louis's favor and conclude that the jury convicted him for the gross sexual imposition that occurred immediately after he grabbed N.M. by the arm and prevented her from leaving the basement.

{¶ 62} Based upon this assessment, the first three questions set forth in *Ruff* can be easily answered. In this case, there was only one victim, the offenses were not committed separately, and the resulting harm from each offense was the same. Louis restrained N.M. and prevented her from leaving the basement in order to commit the offense of gross sexual imposition. He then pulled her over to him and placed her hand on his penis. N.M. testified that the entire incident in the basement, including the touching of N.M.'s breasts, lasted no longer than 20 minutes. The offenses were similar in import and were not committed separately. The third question requires us to look to the holding in *Logan*. Here, the restraint of N.M. was merely incidental to the gross sexual imposition. Although the confinement was secretive, i.e. in the basement, the restraint was not prolonged and the movement was not substantial. Also, we cannot say that N.M. was subjected to a substantial risk of harm separate and apart from the gross sexual imposition.

{¶ 63} Based upon these facts, we cannot conclude that Louis was motivated by something other than the intended sexual assault. Nor can we conclude that the restraint had any significance apart from facilitating the gross sexual imposition. Thus, we conclude that Louis was entitled to a merger of the offenses of gross sexual imposition and kidnapping.

{¶ 64} The fifth assignment of error is sustained.


## VI.     Conclusion

{¶ 65} Louis's first, second, third and fourth assignments of error are overruled. Louis's fifth assignment of error is sustained. Accordingly, the judgment of the trial court is reversed in part and remanded to the trial court for merger of the kidnapping and gross sexual imposition convictions and resentencing thereon. In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


HALL, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
April F. Campbell
Jean Brunel Pierre Louis
Hon. Richard Skelton