[Cite as *State v. Rasheed*, 2024-Ohio-3424.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                          :
                                       :
        Appellee                       :        C.A. No. 29917
                                       :
v.                                     :        Trial Court Case No. 2022 CR 03026
                                       :
MALIK TALEEB RASHEED                   :        (Criminal Appeal from Common Pleas
                                       :        Court)
        Appellant                      :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on September 6, 2024

. . . . . . . . . . .

DAVID R. MILES, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Malik Taleeb Rasheed appeals from his conviction for felonious assault in the Montgomery County Common Pleas Court following a jury trial. For the following reasons, the judgment of the trial court will be affirmed.

## I.    Facts and Course of Proceedings

{¶ 2} On November 1, 2022, Rasheed was indicted by a Montgomery County grand jury on one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), and one count of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), both felonies of the second degree.

{¶ 3} Rasheed was originally scheduled for arraignment on November 3, 2022, which the arraignment was continued by the court until November 7, 2022, at which point counsel was appointed.   Rasheed successfully moved for a continuance from November 23, 2022, until December 5, 2022.   On December 5, 2022, a trial date was scheduled for January 19, 2023.

{¶ 4} On January 3, 2023, Rasheed filed a motion to dismiss count two of the indictment because the indictment failed to specify the specific deadly weapon allegedly used to commit the offense.   The trial court denied Rasheed's motion to dismiss on January 31, 2023, and a new trial date was scheduled for the week of February 16, 2023.

{¶ 5} A final pretrial was held on February 14, 2023.   Rasheed declined to accept a plea offer from the State, and the case proceeded to a jury trial the following day.   After jury selection began, Rasheed informed the court that he wished to proceed pro se.   A discussion was held on the record outside the hearing of the jury, and Rasheed was eventually permitted to proceed pro se.   Following jury selection and after the jury was impaneled and sworn in, Rasheed requested a continuance in order to prepare for trial and further requested to have new standby counsel appointed.   Following lengthy discussions, the court declared a mistrial and continued the trial to the next available date.

{¶ 6} Immediately after the mistrial was declared, Rasheed requested a competency hearing.   On March 16, 2023, the trial court ordered that Rasheed complete a competency evaluation and ordered that he be evaluated as to his sanity at the time of the alleged offenses.   Rasheed was subsequently found competent to stand trial, and trial was scheduled for June 12, 2023.   New counsel was appointed to assist as standby counsel, but Rasheed refused to cooperate with counsel and insisted that he proceed pro se without standby counsel.

{¶ 7} Between the time of the mistrial and the second jury trial, Rasheed filed numerous pro se motions, including several motions to dismiss based on speedy trial violations.   The trial court granted one motion regarding discovery, but all of Rasheed's other motions were overruled.

{¶ 8} A jury trial commenced on June 12, 2023.   The following evidence was presented at trial.

{¶ 9} M.F. testified that she met Rasheed in early September 2022.[1]   At that time, M.F. was living on Kenilworth Avenue with her children.   Because Rasheed was homeless, she allowed him to stay at her house from time to time.   On October 22, 2022, Rasheed came to M.F.'s home around 3:30 p.m., and they ran errands together.   Around 7 p.m. they returned to her home on Kenilworth.   M.F. was in the process of moving, so she continued packing things and cleaning the house while Rasheed went upstairs to lay down on a bed.   At some point, while only the two of them were in the home, M.F. went upstairs to clean the bathroom, and Rasheed got up and started asking M.F. about some

---

[1] In accordance with this Court's policies, we will refer to the victim by initials only.

missing money. Rasheed accused M.F. of stealing $200 from him, which she denied. Rasheed grabbed a Bluetooth speaker that was in the bathroom, held it above his head, and threatened to bash M.F.'s head with it if she did not give him his money. However, instead of hitting her with the speaker, Rasheed grabbed M.F.'s hair and dragged her into the bedroom across the hall. While M.F. was on the bed, Rasheed shouted at her, held his arm to her neck, and then threw her onto the floor. Rasheed forced her legs back into a fold and held her down while he grabbed an iron. Rasheed plugged in the iron and, once it was hot, he pressed it down onto M.F.'s face. M.F. was able to use her feet to unplug the cord of the iron and pushed it off her face. During this struggle, Rasheed repeatedly asked for his money and told M.F. they were both going to die that day.

{¶ 10} After M.F. got out from under the iron, Rasheed dragged her downstairs by her hair. Rasheed struck M.F. a few times and then dragged her to the dining room because she told him his money was stashed in some bags of tea. As she was trying to buy time by looking through tea bags, Rasheed grabbed a ceramic jar and hit her with it across her face, causing a laceration. He told her that he was going to hit her with something every 10 seconds until she gave him his money. While she was pretending to look for the money, Rasheed kicked her with steel toe boots in her chest, causing her to smash into a television.

{¶ 11} After M.F. struck the television, Rasheed went to the living room door. M.F. tried to run through the kitchen to the back door, but Rasheed grabbed her by her hair and dragged her back to the dining room; he then struck her several more times in the face. Rasheed then went into the kitchen, where M.F. had a two-liter jug of aloe, and he

poured it all over her. He also grabbed a gallon of disinfectant and poured it on her.

{¶ 12} Rasheed repeatedly told M.F., who was on the floor, to get up. While she was on the floor, he kicked her in the back and neck several times. He then went to M.F.'s bag, where she kept a handgun, and he took it out. Rasheed told her that neither of them was going to get out of there alive. Rasheed tried to operate the gun, but it had a problem with a screw, and Rasheed just jiggled the gun around without firing it. When Rasheed went to the front door again, M.F. ran out the back door. M.F. saw her neighbors outside. At first, she told them she did not need help because Rasheed came outside beside her, and he still had the gun. When the neighbors started to walk away, Rasheed told M.F. that she needed medical attention and that they should get her to a hospital. However, when Rasheed went back into the house, M.F. ran to her neighbor's house and asked for help. The neighbors called 911 for her.

{¶ 13} M.F. testified that she was taken by medics to the hospital and was hospitalized for a week. She had seven broken ribs, a broken spine, a broken sternum, and missing patches of hair. She needed stitches behind her arm, behind her knee, and on her face due to multiple lacerations. M.F. went to a burn clinic for treatment of her face, but she still had scarring on the left side of her face and her lip at the time of trial; she also had a tilt to her gait at trial as a result of all the injuries.

{¶ 14} After M.F. was released from the hospital, she looked for the iron and the gun. She never found the gun Rasheed had taken but did locate the iron in her belongings after she moved from the Kenilworth residence; she turned the iron over to police. M.F. denied that she had taken any drugs or alcohol on the night of the assault,

but she was aware that Rasheed had had marijuana and mushrooms with him.

{¶ 15} In response to the 911 calls, Dayton Police were dispatched to M.F.'s residence on Kenilworth Avenue on a domestic violence complaint; the officers were told that the victim was at her neighbor's house on Kenilworth and the assailant (with a gun) was inside M.F.'s residence. Dayton Police Officer Richard Thimmes and his partner, Officer Joshua Gundaker, were the first officers to arrive at M.F.'s home. Officer Thimmes testified he made contact with Rasheed as Rasheed walked out the back side door of the house. Rasheed claimed he did not have any weapons on him but his "baby might"; he also told the officers that M.F. had taken mushrooms and freaked out on him. The officers did not locate any weapons on Rasheed, but he did have a bag of marijuana and a lighter.

{¶ 16} After officers obtained consent from M.F.'s son to search her home, they found an ironing board but no iron and a gun box with ammunition but no gun. The officers also found a braid of hair from M.F. on the floor. No drugs or other weapons were found inside the house.

{¶ 17} Dayton Police Sergeant Salli Jones testified that she had responded to the 911 call and went to M.F.'s neighbor's home on Kenilworth, where she observed M.F. sitting on the floor with a towel over her face. M.F. was wrapped in a blanket and her clothing and person appeared to be damp. Sergeant Jones observed burns on M.F.'s face and a laceration on her cheekbone. When officers attempted to speak to M.F., she could only respond with groans and moans. M.F. did not appear to be intoxicated or under the influence; rather, she appeared to be in shock. M.F. was non-responsive to

the officers and was visibly shaking.

{¶ 18} Sergeant Tim Turner of the Montgomery County Sheriff's Office testified to his duties as administrative sergeant for the regional dispatch center, which handles 911 calls. Sergeant Turner testified as the keeper of records for the two 911 calls made on October 22, 2022, by M.F.'s neighbors. The first 911 call was made at approximately 9:50 p.m., with the second call was made around 9:59 p.m. Officers did not arrive on the scene until 10:09 p.m.

{¶ 19} Detective Alaina Hammond of the Dayton Police Department was assigned to the case the day after the assault occurred. Detective Hammond testified she spoke to M.F.'s son and the neighbors on Kenilworth to obtain statements the day after the incident. Hammond attempted to locate any additional witnesses or video cameras from surrounding locations but was unsuccessful. She also obtained a search warrant for Rasheed's vehicle but did not find a gun or an iron there. Days later, Hammond had a canine search the area outside of M.F.'s residence for firearms, without success.

{¶ 20} Detective Hammond met with M.F. while she was still in the hospital. Hammond testified that M.F. appeared to be in a lot of pain. M.F. wore a C-collar on her neck and had a brace with handles on it in the front to help move her torso. Although M.F. was in a hospital bed with bandages around her face and had some difficulty speaking, she provided a statement to Hammond about what had happened.

{¶ 21} Detective Hammond obtained a certified copy of M.F.'s hospital records from Miami Valley Hospital; they showed that she had been admitted on October 22, 2022, and discharged on October 29, 2022. The records also reflected that M.F. had a

C3 cervical fracture, a closed fracture of the sternum, multiple rib fractures, a laceration on her face, lacerations on her right side and right elbow, first-degree facial burns, and a partial thickness burn on her face.

{¶ 22} In late January or early February 2023, Detective Hammond again met with M.F. in person for a statement. By then, M.F.'s appearance had improved and many of her injuries had healed. M.F. provided Detective Hammond with a green bag containing the iron M.F. claimed had been used in the incident. M.F. also provided a gun box for the firearm M.F. said Rasheed had used on the night of the assault, but no firearm was inside the box. The firearm was never located.

{¶ 23} Following the jury trial, Rasheed was found guilty as charged. On July 11, 2023, the parties appeared for sentencing. Although Rasheed had represented himself at trial, he requested counsel for sentencing. Therefore, the trial court appointed counsel and continued the sentencing hearing.

{¶ 24} On August 1, 2023, the parties again appeared for sentencing, this time with Rasheed represented by counsel. The trial court merged the two counts and the State elected sentencing on felonious assault with a deadly weapon. The trial court imposed a mandatory minimum prison term of 8 years with a maximum prison term of 12 years, pursuant to the Reagan Tokes Act. The trial court advised Rasheed that he would be subject to a mandatory term of post-release control upon his release from prison for not less than 18 months but no more than 3 years. The court filed its judgment entry on August 3.

{¶ 25} Rasheed filed a notice of appeal on August 28, 2023. However, this Court

determined that the August 3, 2023 judgment entry was not a final appealable order because it did not set forth the fact of conviction, citing Crim.R. 32(C) and *State v. Lester*, 2011-Ohio-5204. *State v. Rasheed*, Montgomery App. No. 29893 (Decision and Final Judgment Entry, Sep. 11, 2023). We noted that the trial court had filed a nunc pro tunc entry on September 3, 2023, in an attempt to correct its original judgment entry, but because that occurred after the notice of appeal was filed, the trial court lacked jurisdiction to correct the order. Accordingly, that appeal was dismissed for lack of jurisdiction.

{¶ 26} On September 19, 2023, the trial court issued an amended judgment entry from which Rasheed filed a timely notice of appeal. He now raises seven assignments of error.

## II. Speedy Trial

{¶ 27} Rasheed's first assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DISMISS ON SPEEDY TRIAL GROUNDS.

{¶ 28} Rasheed argues that the trial court erred in overruling his several motions to dismiss on statutory speedy trial grounds. Rasheed contends that his speedy trial time should not have been extended by the declaration of a mistrial or the court's referral for Rasheed's competency and sanity evaluations. We do not agree.

{¶ 29} "The right to a speedy trial is a fundamental right guaranteed by the Sixth Amendment to the United States Constitution, made obligatory on the states by the Fourteenth Amendment. Section 10, Article I of the Ohio Constitution guarantees an accused this same right." *State v. Hughes*, 86 Ohio St.3d 424, 425 (1999), citing *State*

*v. MacDonald*, 48 Ohio St.2d 66, 68 (1976). "This constitutional mandate was codified in Ohio by the enactment of R.C. 2945.71, which designates specific time limits for bringing a defendant to trial." *State v. Louis*, 2020-Ohio-951, ¶ 28 (2d Dist.).

**{¶ 30}** Pursuant to R.C. 2945.71(C)(2), a felony defendant must be brought to trial within 270 days after the defendant's arrest. "For purposes of calculating speedy-trial time, 'each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days.' Thus, subject to certain tolling events, a jailed defendant must be tried within 90 days." (Citation omitted.) *State v. Ramey*, 2012-Ohio-2904, ¶ 15, quoting R.C. 2945.71(E). The day of arrest is not included when calculating a defendant's speedy trial time. *State v. Cimpaye*, 2020-Ohio-2740, ¶ 17 (2d Dist.), citing *State v. Cline*, 2003-Ohio-4712, ¶ 27 (2d Dist.).

**{¶ 31}** "Speedy-trial provisions are mandatory, and, pursuant to R.C. 2945.73(B), a person not brought to trial within the relevant time constraints 'shall be discharged,' and further criminal proceedings based on the same conduct are barred." *State v. Sanchez*, 2006-Ohio-4478, ¶ 7, quoting R.C. 2945.73(B) and citing R.C. 2945.72(D). However, "the prescribed times for trial set forth in R.C. 2945.71 are not absolute in all circumstances, but a certain measure of flexibility was intended by the General Assembly by the enactment of R.C. 2945.72, wherein discretionary authority is granted to extend the trial date beyond the R.C. 2945.71 time prescriptions." *State v. Wentworth*, 54 Ohio St.2d 171, 173 (1978), citing *State v. Lee*, 48 Ohio St.2d 208 (1976) and *State v. Davis*, 46 Ohio St.2d 444 (1976). "Accordingly, R.C. 2945.72 contains an exhaustive list of events and circumstances that extend the time within which a defendant must be brought

to trial." *Ramey* at ¶ 24. These include the following relevant circumstances:

(B) Any period during which the accused is mentally incompetent to stand trial or during which the accused's mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;

(C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon the accused's request as required by law;

(D) Any period of delay occasioned by the neglect or improper act of the accused;

(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

. . .

(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion . . .

R.C. 2945.72.

{¶ 32} "Upon review of a speedy-trial issue, a court is required to count the days of delay chargeable to either side and determine whether the case was tried within applicable time limits." *Sanchez* at ¶ 8. "A defendant establishes a prima facie speedy trial violation when his motion reveals that a trial did not occur within the time period

prescribed by R.C. 2945.71." *State v. Hill*, 2020-Ohio-2958, ¶ 6 (2d Dist.), citing *State v. Butcher*, 27 Ohio St.3d 28, 31 (1986). "If a defendant 'establishes a prima facie case of a violation of his right to a speedy trial, the burden then shifts to the State' to demonstrate either that the statutory limit was not exceeded, or that the State's time to bring the defendant to trial was properly extended." *State v. Wagner*, 2021-Ohio-1671, ¶ 12 (2d Dist.), quoting *State v. Nichols*, 2005-Ohio-1771, ¶ 11 (5th Dist.), citing *Butcher* at 30-31. "Review of a speedy-trial claim involves a mixed question of law and fact. Therefore, we defer to the trial court's factual findings if they are supported by competent, credible evidence, but we review the application of the law to those facts de novo." *State v. Long*, 2020-Ohio-5363, ¶ 15.

{¶ 33} First, Rasheed argues that his speedy trial rights were violated before his first trial started on February 15, 2023. The record reflects that Rasheed was arrested on October 22, 2022, so his statutory speedy trial time started to run on October 23, 2022. He was held in custody solely on these charges for the duration of the case; therefore, Rasheed was entitled to the triple-count provision enumerated under R.C. 2945.71(E). Absent any tolling events, Rasheed's speedy trial time of 90 days would have expired on January 20, 2023.

{¶ 34} On November 23, 2022, a scheduling conference was held at which defense counsel requested a continuance. The request was granted, and the matter was continued until December 5, 2022. Counsel's request for a continuance constituted a tolling event and extended Rasheed's speedy trial time an additional 13 days. *See* R.C. 2945.72(H) (speedy trial time is extended for "[t]he period of any continuance

granted on the accused's own motion.").

{¶ 35} On December 5, 2022, Rasheed orally requested that the case be dismissed on speedy trial grounds, which the trial court orally overruled. Because Rasheed's speedy trial rights had not been violated at that time, the trial court did not err in denying Rasheed's motion to dismiss. That same day, a jury trial was scheduled for January 19, 2023, with a final pretrial on January 6, 2023.

{¶ 36} On January 3, 2023, Rasheed filed a motion to dismiss one count of the indictment. Two days later, counsel filed a motion to withdraw. At the January 6, 2023 final pretrial hearing, the trial court granted counsel's motion to withdraw, appointed new counsel, and continued the case until January 10, 2023. On January 10, 2023, newly-appointed counsel requested a continuance of one week, which the trial court granted. Although, generally, lack of counsel for the accused and/or counsel's request for a continuance would constitute tolling events, time was already being tolled at that point due to Rasheed's January 3, 2023 motion to dismiss. The tolling ended when the trial court overruled the motion to dismiss on January 31, 2023. *State v. Bickerstaff*, 10 Ohio St.3d 62, 67 (1984) ("It is evident from a reading of the statute that a motion to dismiss acts to toll the time in which a defendant must be brought to trial.") Thus, time was tolled an additional 29 days from January 3, 2023, until January 31, 2023.

{¶ 37} On January 31, 2023, a jury trial was scheduled for the following month. Defense moved to dismiss on speedy trial grounds, which the court orally overruled. Once again, due to prior tolling events, the trial court did not err in overruling the motion to dismiss because Rasheed's speedy trial time had not yet expired. Rasheed's first jury

trial began on February 15, 2023. Considering that 42 days were tolled, we conclude that Rasheed's first trial began prior to the expiration of his speedy trial time, which would have been in early March 2023.

{¶ 38} After jury selection, a mistrial was declared, and the jury was discharged. Rasheed's second jury trial did not begin until June 12, 2023. According to Rasheed, his speedy trial time was not extended by the mistrial because it was not a tolling event. We agree that a mistrial is not a tolling event pursuant to R.C. 2945.71, because following a mistrial, R.C. 2945.71 does not apply, and the standard to be applied for speedy trial purposes is "reasonableness under federal and state constitutions." *State v. Fanning*, 1 Ohio St.3d 19, 21 (1982).

{¶ 39} Consistent with constitutional speedy trial standards, the reasonableness standard requires a four-factor analysis: "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant." *State v. Hull*, 2006-Ohio-4252, ¶ 21-22, citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "[T]hese four factors are balanced considering the totality of the circumstances, with no one factor controlling." *State v. Perkins*, 2009-Ohio-3033, ¶ 8 (2d Dist.), citing *Barker*.

{¶ 40} The trial court found that the delay between Rasheed's mistrial and the commencement of his second trial was reasonable and therefore that Rasheed's constitutional speedy trial rights had not been violated. Under the facts of this case, we agree that Rasheed's constitutional speedy trial rights were not violated and, therefore, the trial court did not err in overruling Rasheed's multiple motions to dismiss on speedy

trial grounds. Here, the length of the delay between Rasheed's mistrial and the second trial was 116 days, which is not generally considered unreasonable for a felony case. "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker* at 530. "A delay becomes presumptively prejudicial as it approaches one year in length." *State v. Adams*, 2015-Ohio-3954, ¶ 90, citing *Doggett v. United States*, 505 U.S. 647, 652, fn. 1 (1992).

**{¶ 41}** Assuming (without deciding) that the approximately four-month delay triggered a *Barker* analysis, the delay was not sufficiently prejudicial to merit the dismissal of the charges against Rasheed. First, the State was not responsible for the delay. "Only the portion of the delay which is attributed to the government's neglect is to be weighed in a defendant's favor." *State v. Triplett*, 78 Ohio St.3d 566, 569 (1997), citing *Doggett* at 658. The reasons for the mistrial were Rasheed's eleventh-hour request to proceed pro se and his inability to do so without newly appointed standby counsel and an opportunity to prepare. Accordingly, the initial delay was the result of Rasheed's actions and could not be attributed to the State. A new trial date was then scheduled at the court's earliest availability, approximately two months later on April 24, 2023. However, that trial date was vacated and continued as a result of Rasheed's request for a competency evaluation, during which time the trial court could not have proceeded to trial. *State v. Berry*, 72 Ohio St.3d 354, 359 (1995) (stating that a criminal defendant who is legally incompetent may not be tried). Although Rasheed contends that the trial court should have neither granted a mistrial nor ordered a competency evaluation, neither of

those decisions was an abuse of discretion, as we will address later in this opinion. When Rasheed was found competent on May 9, 2023, the trial was scheduled for June 12, 2023, and the jury trial commenced on that date. Accordingly, the second *Barker* factor weighed against finding a constitutional speedy-trial violation.

{¶ 42} There is little doubt that Rasheed asserted his right to a speedy trial by repeatedly filing motions to dismiss for speedy trial violations. The record reflects that, following his mistrial, Rasheed filed more than 20 motions, the majority of which sought dismissal of his charges; the State responded to those motions, and the trial court issued decisions. Although the third *Barker* factor weighed in favor of Rasheed, this factor was not dispositive.

{¶ 43} Finally, we see no prejudice to Rasheed as a result of the delay. The initial reason for the delay, i.e. granting the mistrial, was to *prevent* Rasheed from being prejudiced by having to proceed pro se without standby counsel and without sufficient preparation. The second delay, the competency evaluation, was also conducted for Rasheed's benefit, at his request, to make sure he was legally capable of proceeding to trial. Nevertheless, Rasheed claims in his brief that he was prejudiced because, in his first trial, the State questioned the prospective jurors about the possibility that the victim would not testify at trial, but this did not occur at the second trial at which the victim did testify. But Rasheed had the same opportunity to question the prospective jurors that the State did. Rasheed has failed to explain how this fact prejudiced him. The fourth *Barker* factor weighed against finding a constitutional violation.

{¶ 44} In balancing the *Barker* factors, we conclude that the delay in this case was

not constitutionally unreasonable.   The first assignment of error is overruled.

### III.    Mistrial

{¶ 45} The second assignment of error states:

THE TRIAL COURT ERRED IN DECLARING A MISTRIAL.

{¶ 46} Rasheed claims that the trial court abused its discretion in declaring a mistrial sua sponte, because he only requested a minimal continuance of the trial and a fair trial was still able to be had.   The State responds that the trial court did not abuse its discretion in declaring a mistrial because of Rasheed's impromptu decision to represent himself on the day of trial and his inability to do so without a continuance.

{¶ 47} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible."   (Citations omitted.)   *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).   Reviewing courts grant "great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial."   *State v. Glover*, 35 Ohio St.3d 18, 19 (1988).   The Ohio Supreme Court, recognizing that there are a variety of circumstances in which a mistrial may arise, "has been reluctant to formulate precise, inflexible standards.   Rather, the court has deferred to the trial court's exercise of discretion in light of all the surrounding circumstances . . . ."   *State v. Widner*, 68 Ohio St.2d 188, 190 (1981).   "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion."   (Citations omitted.)   *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001).   "A trial court abuses its discretion when it makes a decision that is unreasonable,

unconscionable, or arbitrary." *State v. Darmond*, 2013-Ohio-966, ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id.*, citing *State v. Morris*, 2012-Ohio-2407, ¶ 14.

{¶ 48} "In examining the trial judge's exercise of discretion in declaring a mistrial, a balancing test is utilized, in which the defendant's right to have the charges decided by a particular tribunal is weighed against society's interest in the efficient dispatch of justice." *Glover* at 19, citing *State v. Calhoun*, 18 Ohio St.3d 373, 376 (1985); *United States v. Scott*, 437 U.S. 82, 92 (1978). "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949). "Where the facts of the case do not reflect unfairness to the accused, the public interest in insuring that justice is served may take precedence." *Glover* at 19, citing *Arizona v. Washington*, 434 U.S. 497, 505 (1978).

{¶ 49} After a lengthy discussion on the record, the trial court declared a mistrial based on the following reasoning:

I think that Mr. Rasheed has made the record that he doesn't want to be represented by [defense counsel]. He's also made the record that he is not prepared to go forward today. And in the judgment of the Court, he won't be ready to go for the balance of this week, as a result of which I'm going to declare a mistrial of this case, or of this trial, based on the conduct of Mr. Rasheed, who has said, number one, he doesn't want to be

represented by [defense counsel]. Number two, he needs to be represented -- he needs additional time for preparation. . . . And number three, because at this point, I don't think that Mr. Rasheed is capable at this time of defending this case.  So we'll declare a mistrial.  We'll excuse the jury.  We'll give you a date of the 24th of April.  If we can move something in sooner than that, fine.

Mistrial Tr. 192.

{¶ 50} The record supports the trial court's decision to grant a mistrial.  At the beginning of the jury trial, Rasheed was represented by counsel.  Then, shortly after defense counsel began voir dire, Rasheed stated for the first time that he wished to proceed pro se.  Eventually, the trial court agreed to permit him to do so.  However, by the time Rasheed informed the court that he was unprepared to go forward with the jury trial without a continuance, the jury had already been selected and sworn in.  Although Rasheed indicated he only needed a continuance for a few days, the trial court's schedule was unable to accommodate that.   The following Monday was a federal holiday, and the courtroom was unavailable for several weeks.  (The trial court judge at that time was a visiting judge who was using another judge's courtroom, which was unavailable in the ensuing weeks.)  The trial began on a Wednesday morning, and the discussion of a mistrial occurred that afternoon.  The trial court informed Rasheed that he could have the rest of the evening to prepare to go forward with trial the following day, but Rasheed declined, indicating that he needed more time than that to prepare.  Although Rasheed was unequivocal that he wanted to represent himself, he also requested new standby

counsel and was adamant that he was not prepared to go forward with the trial without a continuance. The trial court informed Rasheed that, in order to timely appoint new standby counsel and provide Rasheed additional time to prepare, the trial would not be able to go forward with the jury that had already been seated.

{¶ 51} Under these circumstances, the trial court did not abuse its discretion in declaring a mistrial. The trial court's reasoning reflected significant justification for declaring a mistrial and that the ends of justice would have otherwise been defeated. Accordingly, Rasheed's second assignment of error is overruled.

## IV. Competency and Sanity Evaluations

{¶ 52} Rasheed's third assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING A NOT GUILTY BY REASON OF INSANITY EVALUATION AND A COMPETENCY TO STAND TRIAL EVALUATION.

{¶ 53} Rasheed argues that the trial court abused its discretion by ordering competency and insanity evaluations. According to Rasheed, the reason the trial court ordered the evaluations was "to get around appellant's speedy trial rights." Appellant's Brief, p. 11. We do not agree.

{¶ 54} "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *Berry*, 72 Ohio St.3d at 359. "If a defendant 'lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[,]' he may not stand trial." *State v. Voris*, 2022-Ohio-152, ¶ 34 (2d Dist.), quoting *State v. Skatzes*,

2004-Ohio-6391, ¶ 155.

{¶ 55} "In a criminal action in a court of common pleas, . . . the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion." R.C. 2945.37(B). If the issue of a defendant's competence to stand trial is raised, the court may order one or more evaluations of the defendant's present mental condition. R.C. 2945.371(A). "[W]e review the decision of the trial court regarding competency evaluations for an abuse of discretion." (Citations omitted.) *State v. Matharu*, 2017-Ohio-8251, ¶ 15 (2d Dist.).

{¶ 56} In this case, it was Rasheed who raised the issue of competency and specifically requested a competency evaluation. Immediately after the trial court declared a mistrial on February 15, 2023, Rasheed stated that "I need a . . . competency hearing." Mistrial Tr. 193. Because the trial court had already declared a mistrial and rescheduled a new trial date, Rasheed's request occurred before trial. Where a defendant has raised the issue of competency before trial, courts have found that R.C. 2945.37(B) requires that a hearing be held. *State v. Mills*, 2023-Ohio-4716, ¶ 13.

{¶ 57} The judge issued an order for both a competency and a sanity evaluation on March 16, 2023. The entry ordering the competency evaluation noted that Rasheed's "behavior in court on February 15, 2023, has raised for the court the issue of his competence to stand trial." Entry Ordering Competency Evaluation. As noted above,

after the mistrial was declared, Rasheed specifically requested a competency hearing. The record further reflects that during the court proceedings on February 15, 2023, Rasheed repeatedly interrupted the trial court judge, argued with his appointed counsel, and restated arguments indicating his refusal to listen to the court. Notably, the trial court's entry granting the mistrial described Rasheed's actions in court as follows: "after observing over a protracted period of time Rasheed's apparent failure to comprehend the trial process, despite attempts by the court and counsel to explain it to him, and his constant disruptive interruptions of the proceedings, the court concluded the trial could not proceed." Order, February 16, 2023. We cannot conclude that the trial court abused its discretion in ordering a competency evaluation under these circumstances.

{¶ 58} Rasheed did not file a plea of not guilty by reason of insanity as is required under R.C. 2943.04. Nevertheless, the trial court ordered a sanity evaluation at the same time the competency evaluation was ordered. Even assuming the trial court erred in ordering an insanity evaluation, we see no prejudice to Rasheed warranting a reversal.

{¶ 59} "Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.' " *State v. Morris*, 2014-Ohio-5052, ¶ 23. Generally, an error is viewed as affecting a defendant's substantial rights only if the error was prejudicial. *State v. Harris*, 2015-Ohio-166, ¶ 36. "Accordingly, Crim.R. 52(A) asks whether the rights affected are 'substantial' and, if so, whether a defendant has suffered any prejudice as a result." *Id.*, citing *Morris* at ¶ 24-25.

{¶ 60} Rasheed's concern on appeal is that the orders for competency and sanity

evaluations were made in an attempt to circumvent Rasheed's speedy trial rights. But this argument lacks merit. Both the competency evaluation, which we concluded was not an abuse of discretion for the trial court to order, and the insanity evaluation were conducted by the same psychologist on the same day. Thus, conducting the sanity evaluation in no way lengthened the time for which Rasheed was held in custody or postponed his trial date further than was already accomplished by Rasheed's having the competency evaluation. Moreover, no information obtained in the sanity evaluation was used against Rasheed at trial. Because the sanity evaluation had no effect on Rasheed's speedy trial rights, as he suggests, or on the outcome of his trial, we conclude any alleged error in ordering the sanity evaluation was harmless.

{¶ 61} Rasheed's third assignment of error is overruled.

## V. Sufficiency of the Evidence

{¶ 62} In his fourth assignment of error, Rasheed argues:

APPELLANT'S CONVICTIONS FOR FELONIOUS ASSAULT ARE BASED UPON INSUFFICIENT EVIDENCE.

{¶ 63} Rasheed contends there was insufficient evidence to identify him as the perpetrator of the offense because the police did not find the iron or the gun on the night of the assault and because Rasheed did not attempt to evade the police. Further, Rasheed argues that there was insufficient evidence to establish that the iron was a deadly weapon for him to be convicted under R.C. 2903.11(A)(2).

{¶ 64} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to

the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "[T]he relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

### a. Identity

{¶ 65} "The State has the burden to prove every element of the crime charged beyond a reasonable doubt, including the identity of the person who committed the crime." (Citations omitted.) *State v. Bailey*, 2017-Ohio-2679, ¶ 18 (2d Dist.). Proof of the identity of the accused can be made by circumstantial or direct evidence. *State v. Tate*, 2014-Ohio-3667, 15, citing *Jenks* at 272-273. "Ohio courts have held that the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 2011-Ohio-1024, ¶ 42 (10th Dist.), citing *State v. Dunn*, 2009-Ohio-1688, ¶ 133 (5th Dist.).

{¶ 66} Viewing the evidence in the light most favorable to the prosecution, we find that a reasonable jury could have found that the State had established Rasheed's identity beyond a reasonable doubt. M.F.'s testimony alone provided sufficient evidence of identity to support a conviction. M.F. testified that she had met Rasheed in early September 2022, and they had developed a relationship. Her testimony at trial identified Rasheed as the perpetrator who assaulted her on October 22, 2022, and she provided

an in-court identification of Rasheed. M.F. was unwavering in her identification of Rasheed as the perpetrator of the assault.

{¶ 67} In addition to M.F.'s testimony, multiple officers identified Rasheed as the individual arrested at M.F.'s home on October 22, 2022, and testified that he was the individual in the police body camera footage that was shown to the jury. Moreover, although Rasheed did not testify, he made it obvious to the jury through his questioning of the witnesses that he was present with M.F. at her residence on October 22, 2022. The fact that the police did not find the iron or the gun on the night of the assault, or that Rasheed did not attempt to evade the police that night, did not detract from the evidence establishing his identity as the perpetrator of the offense. Accordingly, this argument is without merit.

### b. Deadly Weapon

{¶ 68} Rasheed was convicted of felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2). "Deadly weapon" is defined as being "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). While some objects are frequently considered deadly weapons in and of themselves, such as firearms, others, owing to the manner in which they are used, can become deadly weapons. *See, e.g.*, *State v. Dean*, 2019-Ohio-1391, ¶ 10 (9th Dist.) (holding that a billiard ball thrown at a victim's head constituted a deadly weapon); *State v. Clark*, 2018-Ohio-4789, ¶ 58-59 (5th Dist.) (holding that a mop handle was a deadly weapon when struck against victim's face); *In re Smith*, 142 Ohio App.3d 16, 24 (8th Dist. 2001)

(concluding that a reasonable trier of fact could find the end of a ballpoint pen could constitute a deadly weapon). Whether an object constitutes a deadly weapon "is a determination highly dependent upon the facts and circumstances of each case." (Citations omitted.) *State v. Byrd*, 1986 WL 13239, *3 (2d Dist. Nov. 20, 1986). "The manner of use of the instrument, its threatened use, and its nature determine its capability to inflict death." *State v. Deboe*, 62 Ohio App.2d 192, 193 (6th Dist. 1977). "A jury is permitted to infer the deadly nature of an instrument from the facts and circumstances of its use." *State v. Vondenberg*, 61 Ohio St.2d 285, 289 (1980).

{¶ 69} The testimony at trial established that Rasheed plugged in an iron to heat it up and then pressed the hot iron onto M.F.'s face, which caused significant burns. M.F. testified that, as Rasheed was plugging in the iron and holding her down, he said that they were both going to die that day. Although we acknowledge that an iron is not typically thought of as a deadly weapon, the testimony at trial established that the iron was used as a weapon and, further, that Rasheed was threating the victim not only with harm but with death while he used the iron as a weapon. The fact that Rasheed's use of the iron did not result in death under these circumstances did not preclude it from being deemed a deadly weapon. Considering the severity of the burns inflicted, the use of the hot iron on the victim's face, and that Rasheed had threatened her with death contemporaneously with using the hot iron, we conclude that a jury could had reasonably concluded that the iron, as used in this case, was a deadly weapon.

{¶ 70} Rasheed's conviction was supported by sufficient evidence, and his fourth assignment of error is overruled.

## VI.    Admissibility of Evidence

**{¶ 71}** In his fifth assignment of error, Rasheed alleges the following:

THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE TWO 911

PHONE CALLS.

**{¶ 72}** Rasheed argues that the trial court erred in admitting two 911 phone calls into evidence because the callers themselves did not testify at trial.   Notably, Rasheed did not object to the admissibility of the two 911 calls on the basis of hearsay or improper authentication during trial.   During Sergeant Turner's testimony, Rasheed made a general objection to the first 911 call and argued about the credibility of the statements made on the recording.   When asked about any objection to admitting the first 911 call, Rasheed indicated that he did not object to the first one and said to "keep the first call." Trial Tr. 678.

**{¶ 73}** Regarding the second 911 call, during Sergeant Turner's testimony, Rasheed again objected based on arguments about the credibility of the statements made on the recording.   However, he then stated that he "wanted to let these jurors hear the second [911 call]."   Trial Tr. 562.   He later objected to the admissibility of the second 911 call based on the credibility of the statements made on the call, but not due to hearsay or its lack of authenticity.   Trial Tr. 678.   In each instance, Rasheed's objections went to the weight of the evidence, but not its admissibility.

**{¶ 74}** "A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below."   *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 10, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997).   Because

Rasheed did not object to the admissibility of the 911 calls with respect to their authentication and admissibility at trial, he has waived all but plain error. *State v. Drummond*, 2006-Ohio-5084, ¶ 187. To show plain error, Rasheed must demonstrate that "an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis added in *Rogers*.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

### a. Proper Authentication

{¶ 75} Evid.R. 901(A) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the material in question is what its proponent claims." "The threshold standard for authenticating evidence pursuant to Evid. R. 901(A) is low, and 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.' " *State v. Arrone*, 2006-Ohio-4144, ¶ 146 (2d Dist.), quoting *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist. 1991). We have held that 911 recordings are sufficiently authenticated when the keeper of such records testifies about how such records are recorded, stored, and retrieved from the system and identifies the recordings at issue as true and accurate copies. *State v. Eicholtz*, 2013-Ohio-302, ¶ 30-31 (2d Dist.).

{¶ 76} Sergeant Turner testified that his duties as the Administrative Sergeant for the Montgomery County Sheriff's Office included being the keeper of records for the regional dispatch center. He testified that the two CDs he had produced contained the

two 911 calls made from the residence of M.F.'s neighbors to the regional dispatch center on October 22, 2022. He further explained how the 911 calls were recorded and stored and how they were retrieved from the system and transferred to a CD. He testified that neither of the CDs had been altered or manipulated and that were true and accurate recordings of the 911 calls made on the date and time in question. Accordingly, Sergeant Turner's testimony provided sufficient authentication for the admission of the two 911 calls.

### b. Hearsay

{¶ 77} "Hearsay" is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, hearsay is not admissible, Evid.R. 802; however, there are several exceptions to the hearsay rule primarily found in Evid.R. 803. The State asserts that the first 911 call fell within the hearsay exception of a present sense impression under Evid.R. 803(1) and the second 911 call fell within the hearsay exceptions of both a present sense impression and an excited utterance. Evid.R. 803(1) and (2).

{¶ 78} A "present sense impression" is defined in Evid.R. 803(1) as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evidence admitted as a present sense impression is an exception to the hearsay rule. Evid.R. 803(1). "There is an assumption that statements or perceptions that describe events uttered during or within a short time from the occurrence

of the event are more trustworthy than statements not uttered at or near the time of the event." *State v. Travis*, 2006-Ohio-787, ¶ 35 (2d Dist.), quoting *State v. Ellington*, 2004-Ohio-5036, ¶ 10 (8th Dist.). Furthermore, "[t]he key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived—a fact which obviously detracts from the statement's trustworthiness." *Cox v. Oliver Machinery Co.*, 41 Ohio App.3d 28, 35-36 (12th Dist. 1987).

{¶ 79} Evid.R. 803(2) likewise excludes excited utterances from the hearsay rule. An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2).

{¶ 80} In this case, no plain error is demonstrated in admitting the recordings of the two 911 calls; they were admissible as present sense impressions. "911 calls are usually admissible under the excited utterance or the present sense impression exception to the hearsay rule." (Citations omitted.) *State v. Norris*, 2015-Ohio-624, ¶ 12 (2d Dist.). Here, M.F. had just been severely beaten when she went next door to her neighbor's house. When the neighbors called 911 shortly thereafter, they relayed to dispatch M.F.'s physical appearance and her need for medical attention. In the first 911 call, a male neighbor described that M.F. was cold, wet, and barefoot. He also informed dispatch that M.F. was injured and needed an ambulance, even though he did not observe any

injuries.   The second 911 call, made less than 10 minutes after the first call, updated dispatch that the neighbors had observed a burn injury to M.F.'s face that they previously had not seen.   A female neighbor insisted that an ambulance come and described to the dispatcher the injuries she had observed on M.F.   The female neighbor stated that the burn on M.F.'s face was bleeding and swelling up and that she could see the "white meat" on M.F.'s face.   She also informed the dispatcher that M.F. was cold, had no shoes on, and was complaining of chest pain.   M.F. was soaking wet and they were trying to keep her warm.   Additionally, the neighbor informed dispatch that M.F. said the guy who had injured M.F. used an iron to burn her face and he might have a gun.

{¶ 81} In each of the two 911 calls, the neighbor's statements were " 'describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter,' and therefore admissible notwithstanding the hearsay rule."   *State v. Tibbetts*, 92 Ohio St.3d 146, 158-159 (2001), quoting Evid.R. 803(1).   Nothing in the record suggests any untrustworthiness of either of the 911 calls, and the observations of the neighbors were corroborated by the testimony and photographic evidence submitted at trial.   Accordingly, the trial court did not abuse its discretion in admitting the two 911 calls into evidence as present sense impressions. Because the calls were admissible under the present sense impression exception to the hearsay rule, we need not consider if the second call also qualified as an excited utterance.

{¶ 82} Although the information about the iron and the gun could potentially be considered hearsay, we discern no error warranting reversal because the admission of

the statement was harmless beyond a reasonable doubt. The State did not offer the statement to prove the truth of the matter asserted or rely on the statement to prove that Rasheed used the iron or had a gun on the night of the incident. By the time the jury heard the 911 calls, M.F. had already testified to the cause of her injuries and that Rasheed had taken her gun. Accordingly, we see no plain error in the admission of the 911 calls.

{¶ 83} Rasheed's fifth assignment of error is overruled.

**VII.    Cross-Examination**

{¶ 84} In his sixth assignment of error, Rasheed argues:

THE TRIAL COURT ERRED IN NOT ALLOWING APPELLANT TO CROSS-EXAMINE A STATE'S WITNESS WITH IMPEACHMENT PURSUANT TO OHIO EVIDENCE RULE 609.

{¶ 85} In support of his sixth assignment of error, Rasheed points to his cross-examination of M.F. in which he asked her, "Have you ever had any run-in with the police or have you been arrested or any type of questionable things – fraud –." Trial Tr. 422-423. The trial court sustained the State's objection to this question, and Rasheed moved on. Rasheed now claims that Evid.R. 609 permitted him to impeach M.F. and that the trial court impermissibly restricted him from doing. Rasheed further argues, without support, that the trial court "should have inquired of appellant the basis for the question and what proof he might have." Appellant's Brief, p. 15.

{¶ 86} "Cross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion

of the trial court.' " *State v. Green*, 66 Ohio St.3d 141, 147 (1993), quoting *Alford v. United States*, 282 U.S. 687, 691 (1931). For the purpose of attacking the credibility of a witness, and subject to Evid.R. 403, evidence that a witness has been convicted of a crime is admissible at trial if: 1) the crime was punishable by death or imprisonment in excess of one year; or 2) the crime involved dishonesty or false statement, regardless of the punishment. Evid.R. 609(A)(1), (3).

{¶ 87} A trial court has broad discretion in determining the extent to which testimony will be admitted under Evid.R. 609. *State v. Wright*, 48 Ohio St.3d 5 (1990), syllabus. Accordingly, unless the trial court "has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64 (2001), citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

{¶ 88} We cannot conclude that the trial court abused its discretion in limiting Rasheed's cross-examination of M.F., as the questioning was impermissible. In accordance with Evid.R. 609, "[o]nly convictions are admissible—not arrests, indictments, or charges." (Citations omitted.) *State v. Graves*, 2016-Ohio-7303, ¶ 23 (8th Dist.). "Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness." *Michelson v. United States*, 335 U.S. 469, 482 (1948). Asking M.F. if she had ever had any run-ins with the police, been arrested, "or any type of questionable things," were all objectionable and not admissible, as none of this history constituted a "conviction"

in accordance with Evid.R. 609.

{¶ 89} If Rasheed intended to use Evid.R. 609 to impeach M.F. based on a prior conviction, the record contains no evidence that M.F. had an admissible prior conviction. "A party may not predicate error on the exclusion of evidence during the examination in chief unless *two* conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party *and* (2) the substance of the excluded evidence was made known to the court by proffer *or* was apparent from the context within which questions were asked." (Emphasis in original.) *State v. Gilmore*, 28 Ohio St.3d 190 (1986), syllabus, applying Evid.R. 103(A)(2). " 'The purpose of a proffer is to assist the reviewing court in determining, pursuant to Evid.R. 103, whether the trial court's exclusion of evidence affected a substantial right of the appellant.' " *State v. Mullins*, 2007-Ohio-1051, ¶ 36 (2d Dist.), quoting *In re Walker*, 2005-Ohio-3773, ¶ 37 (11th Dist.). "In the absence of such a proffer or any such documentation in the record on appeal, we presume that there was no proof of conviction." *In re Watkins*, 1992 WL 104117, *3 (8th Dist. May 14, 1992). Because Rasheed failed to proffer or provide any indication in the record as to what criminal conviction would have been admissible that was excluded, we cannot conclude that the trial court abused its discretion.

{¶ 90} To the extent Rasheed contends that the trial court should have asked him the basis for the question and what proof he might have had, essentially asking Rasheed to make a proffer, we decline to require a court to act as counsel for a pro se defendant. " 'It is well established that pro se litigants are presumed to have knowledge of the law and legal procedures and that they are held to the same standard as litigants who are

represented by counsel.' " *State ex rel. Fuller v. Mengel*, 2003-Ohio-6448, ¶ 10, quoting *Sabouri v. Ohio Dept. of Job & Family Servs.*, 145 Ohio App.3d 651, 654 (10th Dist. 2001). "[A] pro se litigant 'cannot expect or demand special treatment from the judge, who is to sit as impartial arbiter.' " *Yocum v. Means*, 2002-Ohio-3803, ¶ 20 (2d Dist.), quoting *Kilroy v. B.H. Lakeshore Co.*, 111 Ohio App.3d 357, 363 (8th Dist. 1996). It was Rasheed's burden to make the appropriate inquiry and to provide a proffer, if needed. It was not the duty of the trial court to assist him in the practice of law.

{¶ 91} Rasheed's sixth assignment of error is overruled.

## VIII. Sentencing Entry

{¶ 92} In his final assignment of error, Rasheed raises the following error:

THE TRIAL COURT ERRED IN NOT PLACING REAGAN TOKES LANGUAGE IN THE SENTENCING JUDGMENT ENTRY.

{¶ 93} Rasheed does not dispute that the trial court properly informed him of the required notifications under the Reagan Tokes Act at the time of sentencing. However, Rasheed argues that the court erred by not including those notifications in its written judgment entry. We do not agree.

{¶ 94} "The 'Reagan Tokes Law,' which became effective in March 2019, requires that for certain first- and second-degree felony offenses, a sentencing court impose on the offender an indefinite sentence consisting of a minimum and a maximum prison term." *State v. Hacker*, 2023-Ohio-2535, ¶ 1. When sentencing an offender to an indefinite prison term, the trial court must first select a stated minimum term from a range of potential minimum prison terms. R.C. 2929.14(A)(1)(a) and (2)(a). The maximum

prison term is then calculated based on the amount of time equal to the minimum term imposed on the offender plus fifty per cent of the length of that minimum term. R.C. 2929.144(B)(1). "Under R.C. 2967.271(B) through (D), there is a presumption that the offender will be released on the expiration of his or her minimum prison term or earned early-release date, but the statute enables [the Ohio Department of Corrections] to rebut the presumption and keep the offender incarcerated up to the expiration of his or her maximum prison term." *State v. Maddox*, 2022-Ohio-764, ¶ 4.

{¶ 95} A trial court is required to notify the offender of all the Reagan Tokes advisements set forth in R.C. 2929.19(B)(2)(c) at the sentencing hearing. *State v. Massie*, 2021-Ohio-3376, ¶ 23 (2d Dist.). "Those notifications generally pertain to the offender's minimum and maximum prison term and to the existence and operation of a rebuttable presumption of release from service of the sentence upon expiration of the minimum term." *State v. Clark*, 2022-Ohio-2801, ¶ 7 (2d Dist.). In addition to orally informing the defendant of the minimum prison term and the maximum prison term imposed at the time of sentencing, the prison terms must also be included in the judgment entry. R.C. 2929.144(C).

{¶ 96} Rasheed filed a timely notice of appeal from the August 3, 2023 judgment entry; the entry did not contain any Reagan Tokes advisements. However, when the appeal of the August 3, 2023 judgment entry was dismissed for lack of a final appealable order, the case was remanded, and a new entry was filed on September 19, 2023. In addition to stating the minimum and maximum prison terms for the offense for which Rasheed had been convicted, the new entry included the following Reagan Tokes

notification:

> The defendant was advised that there is a rebuttable presumption that he/she will be released from service of the sentence at the expiration of the minimum term or presumptive early release date, whichever is earlier, and that the Department of Rehabilitation and Corrections may rebut the presumption if it makes certain specified determinations.

{¶ 97} According to Rasheed, each of the specific notifications identified in R.C. 2929.19(B)(2)(c)(i)-(v) must also be included in the sentencing entry, rather than the abbreviated description provided in the trial court's entry. He argues that the same analysis that applies to post-release control notifications should also apply to Reagan Tokes notifications. We disagree.

{¶ 98} R.C. 2929.19(B)(2) states in relevant part that "if the sentencing court determines *at the sentencing hearing* that a prison term is necessary or required, the court shall do all of the following . . . ." (Emphasis added.) The phrase "all of the following" refers to multiple subsections concerning certain necessary sentencing notifications, including, but not limited to, R.C. 2929.19(B)(2)(c). That section provides that if a trial court imposes a non-life felony indefinite prison term, the trial court must "notify the offender" of the advisements set forth in R.C. 2929.19(B)(2)(c)(i)-(v). Unlike R.C. 2929.19(B)(2)(b) or 2929.19(B)(2)(g)(i), which require the *sentencing entry* to include certain information, nothing in R.C. 2929.19(B)(2)(c) requires that the notifications be included in the sentencing entry. While R.C. 2929.144(C) provides that both the minimum and maximum prison terms must be included in the sentencing entry, it does

not require that all the other notifications identified in R.C. 2929.19(B)(2)(c) also be included in the sentencing entry. Certainly, had the legislature wanted to require the Reagan Tokes notifications to be included in the sentencing entry, it could have chosen to do so. We agree with the Twelfth District Court of Appeals, which recently concluded that the plain language of "R.C. 2929.19(B)(2)(c) *only* requires that a sentencing court 'notify' the offender of the Reagan Tokes advisements orally 'at the sentencing hearing,' and does not require that the court repeat those advisements in the *written* sentencing entry." (Emphasis in original.) *State v. McIntosh*, 2023-Ohio-4022, ¶ 58 (12th Dist.).

{¶ 99} Even though the statute does not require the notifications be included in the sentencing entry, Rasheed relies on *State v. Bates*, 2022-Ohio-475, to support his argument that they should be included. In *Bates*, the Ohio Supreme Court reaffirmed that once the trial court orally provides all the required advisements for post-release control at the sentencing hearing, it must also incorporate those advisements into the sentencing entry. *Id.* at ¶ 12, citing *State v. Grimes*, 2017-Ohio-2927, ¶ 8. According to Rasheed, the same analysis that requires post-release control notifications to be included in the judgment entry should similarly apply to the Reagan Tokes notifications. We do not agree.

{¶ 100} " 'Post-release control' means a period of supervision by the adult parole authority after a prisoner's release from imprisonment, other than under a term of life imprisonment, that includes one or more post-release control sanctions imposed under section 2967.28 of the Revised Code." R.C. 2967.01(N). Every prison sentence imposed upon an offender shall include a requirement that the offender either will or may

be subject to a period of post-release control imposed by the parole board after the offender's release from imprisonment. R.C. 2967.28(B) and (C). The Ohio Supreme Court has explained that post-release control notifications must be made part of the journal entry of sentencing "because it is the sentencing entry that 'empowers the executive branch of government to exercise its discretion . . . .' " *Grimes* at ¶ 15, quoting *State v. Jordan*, 2004-Ohio-6085, ¶ 22, citing *Woods v. Telb*, 89 Ohio St.3d 504, 512-513 (2000). In *Jordan*, the Court reaffirmed that the post-release control notifications must be included in the sentencing entry "because the separation-of-powers doctrine precludes the executive branch of government from impeding the judiciary's ability to impose a sentence, the problem of having the Adult Parole Authority impose postrelease control at its discretion is remedied by a trial court incorporating postrelease control into its original sentence." *Jordan* at ¶ 19, citing *Woods* at 512-513. "Consequently, unless a trial court includes postrelease control in its sentence, the Adult Parole Authority is without authority to impose it." *Id*. Moreover, the "preeminent purpose" of the statutes involving post-release control is notifying offenders "that their liberty could continue to be restrained after serving their initial sentence." *Watkins v. Collins*, 2006-Ohio-5082, ¶ 52. Thus, the imposition of post-release control is considered part of the defendant's sentence and therefore must be included in the sentencing entry.

{¶ 101} On the other hand, in *State v. Hacker*, 2023-Ohio-2535, the Ohio Supreme Court held that because a judge sets the minimum and maximum prison terms under Reagan Tokes, the Ohio Department of Rehabilitation and Correction ("DRC") does not exercise judicial power in violation of the separation of powers when it prolongs an

offender's time in prison within the given sentencing range. *Id.* at ¶ 13-25. "Once the trial court imposes the minimum and maximum prison terms under R.C. 2929.14(A)(1)(a) or (2)(a), the sentence for the offender has been set." *Id.* at ¶ 16. "If the DRC determines that the presumption of release has been rebutted, it may maintain the offender's incarceration—but only within the bounds set by the trial court. It does not impede the court's exercise of its judicial powers." *Id.* Nothing about the analysis in *Hacker* suggests that the separation of powers would be violated if the Reagan Tokes notifications were not included in a sentencing entry. *McIntosh*, 2023-Ohio-4022, at ¶ 65.

{¶ 102} Furthermore, unlike post-release control, the Reagan Tokes notifications do not apply to every prison sentence, and the statutory scheme does not allow the DRC to restrain a defendant's liberty after serving his or her sentence like a post-release control violation could. Once a defendant is sentenced to prison and the trial court imposes the minimum and maximum prison terms, as set forth by statute, the sentence for the offender has been set. Unlike post-release control, the Reagan Tokes notifications are not part of a defendant's sentence but merely information a trial court must provide to a defendant at the time of sentencing. Neither including nor failing to include the R.C. 2929.19(B)(2)(c) notifications in the sentencing entry would have an effect on the DRC's ability to comply with Reagan Tokes sentencing. The DRC will still be required to comply with both statutory and administrative regulations dealing with Reagan Tokes sentences. Therefore, we cannot conclude that the trial court erred in failing to include some, but not all, of the Reagan Tokes notifications in the sentencing entry.

**{¶ 103}** Rasheed's seventh assignment of error is overruled.

## IX.    Conclusion

**{¶ 104}** Having overruled all the assignments of error, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .


EPLEY, P.J. and TUCKER, J., concur.